1   SEAN A. O'KEEFE – State Bar No. 122417
sokeefe@okeefelawcorporation.com

2   **OKEEFE & & ASSOCIATES**
**LAW CORPORATION, P.C.**

3   26 Executive Park, Suite 250
Irvine, CA 92614

4   Telephone: (949) 334-4135
Facsimile: (949) 209-2625

5

6   [Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

7

8                **UNITED STATES BANKRUPTCY COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10                      **SANTA ANA DIVISION**

11

12   In re

13

14   SYNRGO, INC.,
a California corporation,

15

16                Debtor and Debtor-in-
Possession

| | |
|---|---|
| In re | Case No. 8:21-bk- 11264 ES |
| | Chapter 11 Proceeding |
| SYNRGO, INC.,<br>a California corporation, | **DECLARATION OF KARL KLESSIG IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS OF SYNRGO, INC., DEBTOR AND DEBTOR IN POSSESSION** |
|       Debtor and Debtor-in-<br>      Possession | **Date: May 20, 2021**<br>**Time: 10:30 a.m.**<br>**Place: Courtroom 5A**<br>       **411 West Fourth Street**<br>       **Santa Ana, CA 92701** |

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF KARL KLESSIG

I, Karl Klessig, hereby declare and state as follows:

1.      I am over the age of eighteen years and the facts stated herein are within my personal knowledge.

2.      I am the Chief Executive Officer and Chairman and sole director of SYNRGO, Inc. a major processor of information and funds in the mortgage industry (the "Debtor" or "SYNRGO").

3.      I led the combination and integration of three companies to create SYNRGO.

4.      I have managed operations and conducted business in the international marketplace for over fifty years in business development, management consulting and turnaround services. A true and correct copy of my professional resume is attached hereto as Exhibit "1". The facts stated therein are incorporated here as if set forth in full.

### The Debtor

5.      The Debtor is a single-source provider of real estate document recording and post-closing services with 26 offices nationwide, over 300 employees, and more than 42 years of combined experience.

6.      The Debtor is not only a pioneer in the field of document recording, its digital-platform is the best in the business.

7.      The Debtor's deep understanding of real estate and document handling technology has enabled it to offer title companies, lenders, and local jurisdictions a broad suite of expedited and cost-effective recording services. These services are delivered via a personalized customer service approach that anticipates evolving customer needs and provides clients with the highest possible service level.

### The Debtor's Business Model

8.      In a typical recording transaction, a debtor will be tasked with recording a mortgage, deed or other real estate recording with a county recorder. The Debtor will advance the recording charge payable to the county for this transaction, plus applicable transfer taxes, and it

1  will then submit this charge, along with its per transaction services fee to the applicable real estate

2  escrow for payment.

3      9.      The recording charge part of the transaction is a wash. The Debtor's revenue and

4  profit is derived from the fees it charges for these services. In any given day, the Debtor will

5  effectuate thousands of these transactions nationwide for hundreds of customers.

6  <u>**The Debtor's Financial History**</u>

7      10.      As of April of 2021, the Debtor was generating approximately $2.6 million dollars

8  of revenue per month, or approximately $30 million annualized. The company's earnings before

9  interest, taxes and depreciation ("EBITDA") in April were approximately $285,000. Accordingly,

10  for every dollar the Debtor expends in operations, it generates more than a dollar of replacement

11  value.

12      11.      The Debtor's top-line revenue was steadily increasing, until the recent funding issue

13  with its accounts receivables lender, UMB Bank ("UMB", more fully discussed below, and in fact

14  revenue for 2021 was projected to be in $32.0 million range, with EBITDA in the $5.0 million

15  range.

16      12.      Attached hereto as Exhibit "2" are true and correct copies of the Debtor's 2020

17  financials.

18      13.      Attached hereto as Exhibit "3" is a profit and loss statement by month for 2021. The

19  results reflected in this financial are actual results through April of 2021. The results reflected for

20  May through December 2021 are projected results. These projected results were estimated by

21  management based upon the Debtor's 2021 revenue trends and its anticipated operating expenses.

22  <u>**The Debtor's Receivable Financing Arrangement With UMB, Inc.**</u>

23      14.      The Debtor is a party to a financing agreement with UMB, as successor-in-interest

24  to Marquette Commercial Finance.

25      15.      Attached hereto as Exhibit "4" are true and correct copies of UMB's loan

26  documents (the "Loan Documents").

27      16.      The Loan Documents provide for a receivable financing arrangement pursuant to

28  which UMB advances to the Debtor cash equal to a certain percentage of each "Qualified

Account" "assigned" to UMB. Although this advance percentage varies with certain conditions, it is generally approximately 85%.

17.     Under the UMB financing arrangement, the risk of loss is always on the Debtor. If a receivable is uncollectable, the differential remains due and owing by the Debtor.

## The Factors Precipitating The Debtor's Bankruptcy Filing

18.     On Friday, May 14, 2021, UMB unexpectedly refused to make the daily cash advance to the Debtor on its receivables. This advance is typically approximately $2,400,000 per day. The alleged reasons for this refusal to fund are briefly discussed below. However, the effect of this refusal to fund on the Debtor's business is of far more importance.

19.     The daily financing provided by UMB enables the Debtor to pay the recording fees owed to the various county recorders across the country for document recording charges. Unless these charges are timely advanced by the Debtor, the counties will not record the thousands of documents transmitted to the recorders via the Debtor's eRecording system.

20.     Since the recording of deeds and mortgages is absolutely time critical, UMB's unanticipated refusal to advance funds to the Debtor has placed at risk the Debtor's entire customer base. In fact, this precipitate action could well destroy the Debtor's business within weeks if not days, since title insurers and escrow companies cannot accept the recording delays caused this action.

21.     The most important objective of the Debtor's cash collateral motion is to enable the Debtor to obtain access to its cash collections to immediately pay the bills owed to this category of critical vendor. Without this relief, the Debtor will be forced to cease operations and to terminate the employment of over 300 people.

22.     Attached hereto as Exhibit "5" a list of the critical vendors whose prepetition debts the Debtor is seeking authority to pay to ensure the Debtor's continue operations. This would be a "right to pay authorization" not a "have to pay requirement."

23.     The purported defaults under the Loan Document that allegedly precipitated UMB's sudden refusal to fund relate to the ongoing issue of "Direct Collections". To summarize the issue, approximately 20 to 25% of the Debtor's customers (the "Direct Pay Customers") refuse to

forward their account payable checks to the account designated by UMB. These customers, whether through governmental limitations, or internal bureaucratic strictures, will only send their payments to the Debtor directly.

24.     The Debtor has been working on this complication for some time, and UMB has been aware of it for some time. It is a long-term problem that both parties have been aware of and it is one that is in the process of being addressed. UMB's decision not to fund on this basis was unanticipated.

### The Debtor's Proposed Use of Cash Collateral

25.     The budget attached hereto as Exhibit "6" itemizes the expenses that must be paid to continue operations through a final hearing on this motion. These expenses include payroll, standard operating expenses, and county recorder fees. This budget itemizes the minimum cash that is needed to ensure the Debtor's ability to operate during the next three to four weeks. The authorization to pay the Debtor's critical vendors – the counties – is listed as a separate line item below the budget total.

26.     The Debtor's cash collections were $2.6 million in April. May's cash collections are projected to be the same. In addition to these collections, the Debtor has approximately $2.0 million in an account at the Bank of Hemet and it estimates that UMB is holding as much as $20.0 million of the Debtor's funds. Accordingly, sufficient cash is projected to be available to pay all of the expenses listed in Exhibit "6".

### The Debtor's Adequate Protection Showing.

27.     The Debtor's most recent operating results provide compelling evidence in support of the following conclusions:

A.  The Debtor is generating approximately $30.0 million of revenue annually
    based upon April 2021 operational results;

B.  The Debtor is generating over $250,000 of positive EBITDA per month; and

C.  The Debtor's top-line revenue trend and its EBITDA growth is positive.

28.     The Debtor's technological platform, its position in the industry and its attractive customer base makes it a very attractive acquisition target for strategic buyers. Based upon my

1    understanding of the market for companies of this type, I believe a fair market value sale of the

2    company should generate sufficient net proceeds to retire UMB's debt, and possibly the debts

3    owed to other creditors. In contrast, a liquidation sale would not generate sufficient sale proceeds

4    to pay the UMB debt of approximately $40.0 million.

5          29.     Attached hereto as Exhibit "7" is the Debtor's payroll data for the employee payroll

6    obligations that were paid on May 7, 2021. The payroll total due and payable on Friday, May 22,

7    2021, which covers the payroll due for the weeks ending on May 3, 2021 and May 14, 2021, will

8    be approximately the same - $740,000. A second payroll in this approximate amount will be due

9    two weeks later. Both payroll figures are included in Exhibit "6". This payroll does include a

10    payment owed to a corporate officer, Ben Sherman (Chief Operating Officer). However, this

11    officer's compensation will not be paid until his insider compensation application is approved by

12    the Court.

13          30.     The Debtor is in the service business. Its technological platform requires the

14    support of its employees and their willingness to consistently and promptly meet the demands of

15    clients. Unless the payroll and operating expenses are timely paid, the Debtor's business will

16    suffer a catastrophic loss of talent, and customer support.

17          I declare that the foregoing is true and correct under the penalty of perjury.

18          Executed this 18th day of May 2021, in Santa Fe, New Mexico.

19

20

21          Karl Klessig

22

23

24

25

26

27

28

**EXHIBIT 1**

000007

# *Karl K. Klessig*

Mr. Klessig is CEO and Chairman of SYNRGO, Inc. a major processor of information and funds in the mortgage industry, where he has led the combination and integration of three companies to create SYNRGO. Mr. Klessig has managed operations and conducted business in the international marketplace for over fifty years in business development, management consulting and turnaround services.  In addition to extensive activities in both Europe and the Pacific Rim, he has directed an offshore manufacturing facility in the Caribbean.  He has worked on joint ventures in Japan and established operations in Australia, Canada, England, France, Germany, Italy, Switzerland, Malyasia and Brazil.  He has raised equity and development funds for businesses in North America and Europe.

Mr. Klessig is President of The Extant Group, a Management company that has worked for over twenty years with technology companies to increase their value.  He was Vice President of Corporation Service Company and President of its subsidiary Ingeo Systems, Inc., a leader in the recording and management of land title documentation, which was a follow-up to the successful sale of Ingeo to CSC. Mr. Klessig was brought into Ingeo in 2003 to control costs, focus the company and product, and build the business.  In 2001-2002 Karl was President and CEO of Xdrive Technologies, a major dot com company, responsible for its turnaround and sale. From 1999 to 2001 he was an executive at Critical Path responsible for all business alliances and strategy, including the integration of twelve acquired companies.  In 1998-1999 he was Advisor to the Company, and Executive Vice President at ISOCOR, where he successfully directed the doubling of the business, and the sale of the company at a significant multiple.  At Ingeo, Xdrive, Critical Path and ISOCOR he was brought in by the investors, either venture backers and/or investment bankers.

From 1991 to 1997 Karl Klessig was the Founder and CEO of Enterprise Solutions Limited.  ESL installed and integrated many of the largest and most complex logistics, messaging, directory and information security solutions for commercial and government customers in North America, Europe and the Asia Pacific regions, as varied as Wal*Mart, Lowes, McDonald's, bank clearing agencies in Europe, the EU and the U.S. DoD.

From 1983 until its sale in 1989 he was the Founder, Chairman, President and CEO of Quadratron Systems Limited, a software development, manufacturing and distribution Company, with operation in seven countries. It was the leading provider of office automation software to the government and business communities, in forty-one countries to over two million users.  Customers included the European Economic Commission, major PTTs, major banks, defense agencies and many Governments including Australia and New Zealand.

Mr. Klessig has created and established four other companies, including Cadre Systems Limited, a systems integrator where he served as President and CEO until it was sold.  He was also President and CEO of Expeditions Incorporated, which became one of the world's largest tour operators, and is now part of Carlson Waggonlit travel.  As an executive of Encyclopaedia Britannica he was a senior officer of a multimedia publishing start-up in the education field.

Mr. Klessig has also directly participated in multiple turnaround situations as an independent management consultant for many varied clients, including as an advisor in the areas of marketing, sales and business development to clients that included McGraw Hill, Commerce Clearing House and Dataproducts.  In his early business days he managed and led patent research and development activities in the fields of optics, cathode ray tube design and electrophotography.

Mr. Klessig has been an invited speaker in the U.S., Canada, Japan and Europe on topics that include strategic partnering, market directions, technology evolution, business strategies and business direction.  Mr. Klessig has twice started companies with been 51st and 64th on the Inc. 500 list of fastest growing private companies in America.  He also has been nominated twice for National Entrepreneur of the Year.

Mr. Klessig retired as Chairman of the Software Council and a member of the Board of The Open Group and X/Open, a major international standards organization for computers and telecommunications.  Until retiring recently after twenty-five years Karl has been on the Board of Overseers of Illinois Institute of Technology, as well as the Entrepreneurial Board and Alumni Board.  He recently stepped down as Chairman of the Board of New West Symphony.  Mr. Klessig is a partner in multiple wine bars that are located in Public Markets.

Karl's scholastic background includes a Bachelor of Science degree in Physics and Mathematics from Illinois Institute of Technology, and a Master of International Business Administration from West Coast University.

October 2019

**EXHIBIT 2**

5:46 PM
01/06/21
Accrual Basis

## Synrgo, Inc.
## Profit & Loss
### January through December 2020

| | Jan 20 | Feb 20 | Mar 20 | Apr 20 | May 20 | Jun 20 | Jul 20 | Aug 20 | Sep 20 |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | |
| **Income** | | | | | | | | | |
| Court Income | 20,198.00 | 21,081.00 | 15,033.25 | 6,385.10 | 7,182.10 | 13,845.50 | 14,063.50 | 13,832.50 | 16,688.00 |
| **Document Prep Income** | | | | | | | | | |
| Post Closing Service | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Document Prep Income - Other | 400.00 | 75.00 | 100.00 | 150.00 | 100.00 | 300.00 | 375.00 | 400.00 | 425.00 |
| Total Document Prep Income | 400.00 | 75.00 | 100.00 | 150.00 | 100.00 | 300.00 | 375.00 | 400.00 | 425.00 |
| **Mail Service Income** | | | | | | | | | |
| Leased Employee | 11,856.92 | 12,060.00 | 12,435.00 | 18,560.00 | 20,810.00 | 23,060.00 | 23,397.50 | 25,310.00 | 25,310.00 |
| Mail Service Income - Other | 40,647.03 | 30,485.68 | 37,895.60 | 51,733.58 | 52,669.65 | 62,758.42 | 65,363.45 | 62,538.61 | 75,858.31 |
| Total Mail Service Income | 52,503.95 | 42,545.68 | 50,330.60 | 70,293.58 | 73,479.65 | 85,818.42 | 88,760.95 | 87,848.61 | 101,168.31 |
| **Net Reimbursements** | | | | | | | | | |
| Advanced | -55,560,150.70 | -54,372,036.06 | -61,376,424.39 | -44,448,979.74 | -38,476,433.49 | -54,988,402.02 | -71,308,788.06 | -71,677,184.88 | -80,175,816.96 |
| Billed | 55,560,150.70 | 54,372,036.06 | 61,376,424.39 | 44,448,979.74 | 38,476,433.49 | 54,988,402.02 | 71,308,788.06 | 71,677,184.88 | 80,175,816.96 |
| Total Net Reimbursements | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Recording Income | 1,011,108.15 | 1,044,062.64 | 1,287,671.54 | 1,115,316.09 | 1,000,510.29 | 1,242,329.54 | 1,326,074.09 | 1,357,226.04 | 1,510,848.05 |
| **Service Fees Income** | | | | | | | | | |
| Rent Income | 1,000.00 | 1,000.00 | 0.00 | 2,000.00 | 1,000.00 | 2,000.00 | 0.00 | 1,000.00 | 0.00 |
| Service Fees Income - Other | 33,057.92 | 30,113.82 | 39,681.92 | 35,475.80 | 28,355.10 | 39,732.49 | 651,543.38 | 42,505.09 | 33,266.00 |
| Total Service Fees Income | 34,057.92 | 31,113.82 | 39,681.92 | 37,475.80 | 29,355.10 | 41,732.49 | 651,543.38 | 43,505.09 | 33,266.00 |
| Transportation Income | 258,947.33 | 257,819.89 | 270,218.64 | 243,549.80 | 231,122.62 | 215,991.56 | 236,236.70 | 233,401.77 | 242,067.78 |
| Total Income | 1,377,215.35 | 1,396,698.03 | 1,663,035.95 | 1,473,170.37 | 1,341,749.76 | 1,600,017.51 | 2,317,053.62 | 1,736,214.01 | 1,904,463.14 |
| Gross Profit | 1,377,215.35 | 1,396,698.03 | 1,663,035.95 | 1,473,170.37 | 1,341,749.76 | 1,600,017.51 | 2,317,053.62 | 1,736,214.01 | 1,904,463.14 |
| **Expense** | | | | | | | | | |
| Bank Service Charges | 9,393.47 | 7,782.24 | 11,273.64 | 9,385.60 | 17,002.52 | 5,238.18 | 25,646.37 | 44,400.35 | 11,645.75 |
| Computer and Internet Expenses | 23,441.32 | 30,034.86 | 41,785.81 | 31,275.53 | 38,847.90 | 42,414.07 | 83,193.70 | 86,517.61 | 72,805.02 |
| Contributions | 815.00 | 216.68 | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 0.00 | 0.00 |
| Court Expense | 771.29 | 1,432.20 | 1,328.48 | 660.02 | 606.81 | 781.15 | 2,143.54 | 2,720.06 | 1,122.45 |
| Dues and Subscriptions | 7,300.00 | 4,615.00 | 3,312.75 | 2,388.00 | 904.00 | 391.95 | 2,110.66 | 10,606.48 | 1,319.50 |
| Employee Benefits | 122,113.61 | 124,914.00 | 99,308.03 | 101,902.93 | 99,623.24 | 100,041.10 | 97,178.22 | 54,881.99 | 84,234.70 |
| Insurance Expense | 89,808.90 | 28,957.36 | 27,672.45 | 55,150.35 | 33,057.39 | 2,799.18 | 9,069.38 | 2,052.94 | 4,908.06 |
| **Interest Expense** | | | | | | | | | |
| Interest - Mortgage | 0.00 | 0.00 | 0.00 | 0.00 | 28,495.96 | 14,664.60 | 14,154.06 | 14,579.47 | 14,537.62 |
| Interest Expense - Other | 313,714.21 | 320,400.81 | 313,729.12 | 260,307.99 | 268,821.97 | 260,380.13 | 267,203.08 | 277,211.94 | 311,198.48 |
| Total Interest Expense | 313,714.21 | 320,400.81 | 313,729.12 | 260,307.99 | 297,317.93 | 275,044.73 | 281,357.14 | 291,791.41 | 325,736.10 |
| License and Permits | 199.44 | 504.00 | 2,888.35 | 8,575.20 | 200.00 | 1,882.00 | 10,919.80 | 10,919.80 | 0.00 |
| Meeting Expense | 3,808.27 | 5,905.65 | | 1,391.08 | 1,518.30 | 1,247.19 | 3,266.98 | 3,806.84 | 5,336.10 |
| Office Expense | 26,104.55 | 27,956.98 | 40,503.41 | 53,784.44 | 52,549.42 | 32,170.63 | 30,149.60 | 35,363.94 | 48,018.97 |
| Outside Services | 14,967.71 | 14,745.94 | 27,192.92 | 26,396.32 | 19,077.60 | 18,644.37 | 25,782.24 | 83,569.36 | 19,458.56 |
| Payroll - Employer Taxes | 113,133.91 | 92,005.12 | 83,506.81 | 81,889.67 | 84,326.08 | 81,246.64 | 86,980.00 | 88,277.67 | 89,239.58 |
| Payroll - Non-Officer Wages | 1,012,980.44 | 971,759.27 | 1,079,205.47 | 1,143,644.32 | 1,284,277.19 | 1,076,110.16 | 1,175,286.27 | 1,159,066.52 | 1,175,808.53 |
| Payroll Expenses | 10,221.48 | 11,296.06 | 11,830.62 | 11,402.66 | 16,279.80 | 10,798.98 | 11,091.80 | 11,755.95 | 11,830.36 |

Page 2 of 4

000011

5:46 PM
01/06/21
Accrual Basis

## Synrgo, Inc.
## Profit & Loss
### January through December 2020

| | Jan 20 | Feb 20 | Mar 20 | Apr 20 | May 20 | Jun 20 | Jul 20 | Aug 20 | Sep 20 |
|---|---|---|---|---|---|---|---|---|---|
| Postage and Delivery | 50,599.44 | 36,317.81 | 86,032.15 | 56,179.47 | 64,662.22 | 65,451.44 | 65,533.25 | 55,051.92 | 103,476.04 |
| Professional Fees | 44,229.95 | 22,724.00 | 48,626.50 | 34,820.00 | 40,977.00 | 43,729.00 | 51,325.00 | 37,111.25 | 24,787.50 |
| Total Recording Expenses | 197,781.67 | -96,766.77 | 49,478.67 | 41,899.97 | 53,716.84 | 47,253.27 | 52,824.79 | 39,187.72 | 25,521.69 |
| Rent Expense | 50,131.95 | 118,902.17 | 52,855.49 | 49,414.15 | 48,845.30 | 51,105.70 | 45,665.52 | 52,220.00 | 68,851.08 |
| Repair & Maintenance | 4,888.59 | 9,304.76 | 7,703.32 | 29,283.32 | 8,734.02 | 13,287.33 | 17,640.44 | 26,321.25 | 31,686.37 |
| Selling Expense | 9,950.61 | 3,460.31 | 3,954.26 | 1,279.57 | 792.16 | 3,409.39 | 743.52 | 781.00 | 1,594.12 |
| Total Taxes | 5,230.06 | 29,045.10 | -383.71 | 0.00 | 0.00 | 873.38 | 1,685.83 | 0.00 | 1,052.84 |
| Telephone Expense | 34,239.51 | 31,350.15 | 41,916.56 | 36,527.44 | 36,576.82 | 34,344.06 | 37,250.43 | 42,965.48 | 28,043.68 |
| Transportation | 142,696.44 | 124,618.00 | 146,004.73 | 118,876.52 | 105,419.53 | 116,697.87 | 121,953.62 | 115,939.95 | 118,709.41 |
| Travel Expense | 11,456.42 | 13,898.66 | 18,138.59 | 89.37 | 4,087.41 | 5,958.37 | 4,814.52 | 3,908.26 | 1,331.59 |
| Utilities | 4,961.14 | 4,357.80 | 4,872.83 | 4,562.41 | 6,174.34 | 7,031.31 | 8,549.41 | 11,965.40 | 8,832.61 |
| Total Expense | 2,304,939.38 | 1,948,700.36 | 2,203,241.25 | 2,161,086.33 | 2,315,573.82 | 2,038,011.45 | 2,257,162.03 | 2,283,285.89 | 2,285,350.61 |
| Net Ordinary Income | -927,724.03 | -552,002.33 | -540,205.30 | -687,915.96 | -973,824.06 | -437,993.94 | 59,891.59 | -527,071.88 | -360,887.47 |
| Net Income | -927,724.03 | -552,002.33 | -540,205.30 | -687,915.96 | -973,824.06 | -437,993.94 | 59,891.59 | -527,071.88 | -360,887.47 |

**Synrgo, Inc.**
**Profit & Loss**
**January through December 2020**

| | Oct 20 | Nov 20 | Dec 20 | TOTAL |
|---|---|---|---|---|
| Ordinary Income/Expense | | | | |
| Income | | | | |
| Court Income | 13,604.00 | 12,034.50 | 13,142.00 | 167,089.45 |
| Document Prep Income | | | | |
| Post Closing Service | 0.00 | 7,030.00 | 19,245.00 | 26,275.00 |
| Document Prep Income - Other | 800.00 | 850.00 | 0.00 | 3,975.00 |
| Total Document Prep Income | 800.00 | 7,880.00 | 19,245.00 | 30,250.00 |
| Mail Service Income | | | | |
| Leased Employee | 25,310.00 | 25,310.00 | 25,310.00 | 248,729.42 |
| Mail Service Income - Other | 68,268.25 | 62,640.25 | 61,846.93 | 672,705.76 |
| Total Mail Service Income | 93,578.25 | 87,950.25 | 87,156.93 | 921,435.18 |
| Net Reimbursements | | | | |
| Advanced | -83,593,526.01 | -80,672,900.99 | -118,963,599.28 | -815,614,242.58 |
| Billed | 83,593,526.01 | 80,672,900.99 | 118,963,599.28 | 815,614,242.58 |
| Total Net Reimbursements | 0.00 | 0.00 | 0.00 | 0.00 |
| Recording Income | 1,619,544.89 | 1,426,022.99 | 1,666,072.99 | 15,606,787.30 |
| Service Fees Income | | | | |
| Rent Income | 2,000.00 | 1,000.00 | 0.00 | 11,000.00 |
| Service Fees Income - Other | 42,717.27 | 34,348.72 | 30,218.14 | 1,041,015.65 |
| Total Service Fees Income | 44,717.27 | 35,348.72 | 30,218.14 | 1,052,015.65 |
| Transportation Income | 261,307.98 | 262,137.81 | 292,168.21 | 3,004,970.09 |
| Total Income | 2,033,552.39 | 1,831,374.27 | 2,108,003.27 | 20,782,547.67 |
| Gross Profit | 2,033,552.39 | 1,831,374.27 | 2,108,003.27 | 20,782,547.67 |
| Expense | | | | |
| Bank Service Charges | 61,432.94 | 11,648.37 | 10,543.55 | 225,452.98 |
| Computer and Internet Expenses | 12,523.94 | 44,224.39 | 38,332.87 | 545,397.02 |
| Contributions | 0.00 | 0.00 | 629.70 | 6,031.68 |
| Court Expense | 1,645.25 | 1,456.85 | 629.70 | 15,297.80 |
| Dues and Subscriptions | 4,444.55 | 935.00 | 10,754.00 | 49,081.89 |
| Employee Benefits | 81,611.76 | 77,798.25 | 81,047.68 | 1,124,655.51 |
| Insurance Expense | 96,824.78 | 28,857.98 | 42,308.69 | 419,467.46 |
| Interest Expense | | | | |
| Interest - Mortgage | 14,029.36 | 14,451.45 | 13,944.25 | 128,856.77 |
| Interest Expense - Other | 342,238.11 | 333,752.83 | 346,659.99 | 3,615,618.66 |
| Total Interest Expense | 356,267.47 | 348,204.28 | 360,604.24 | 3,744,475.43 |
| License and Permits | 13,150.60 | 2,011.74 | 504.00 | 51,219.82 |
| Meeting Expense | 3,078.26 | 2,055.40 | 1,442.00 | 34,940.12 |
| Office Expense | 30,539.15 | 38,533.62 | 53,207.56 | 468,882.27 |
| Outside Services | 19,345.31 | 9,604.17 | 12,618.63 | 291,403.13 |
| Payroll - Employer Taxes | 90,714.86 | 78,644.71 | 99,458.84 | 1,069,423.89 |
| Payroll - Non-Officer Wages | 1,183,460.01 | 1,119,747.86 | 1,161,679.63 | 13,543,045.67 |
| Payroll Expenses | 11,964.77 | 17,712.81 | 7,830.15 | 144,015.44 |

000013

**Synrgo, Inc.**
**Profit & Loss**
**January through December 2020**

| | Oct 20 | Nov 20 | Dec 20 | TOTAL |
|---|---|---|---|---|
| Postage and Delivery | 70,083.12 | 71,877.38 | 50,382.85 | 775,647.09 |
| Professional Fees | 57,076.61 | 22,105.00 | 20,934.22 | 448,446.03 |
| Total Recording Expenses | 34,409.91 | 36,403.87 | 35,157.46 | 516,869.09 |
| Rent Expense | 37,215.82 | 60,979.70 | 54,485.28 | 690,672.16 |
| Repair & Maintenance | 10,322.63 | 8,357.13 | 13,391.01 | 180,920.17 |
| Selling Expense | 517.50 | 14,733.76 | 1,963.22 | 43,179.42 |
| Total Taxes | 58,855.81 | 0.00 | 85.25 | 96,444.56 |
| Telephone Expense | 38,556.18 | 39,906.12 | 33,126.76 | 434,803.19 |
| Transportation | 117,653.42 | 90,352.09 | 111,959.31 | 1,430,880.89 |
| Travel Expense | 5,504.35 | 2,810.60 | 1,760.37 | 73,758.51 |
| Utilities | 9,525.95 | 8,269.44 | 9,233.18 | 88,335.82 |
| Total Expense | 2,406,724.95 | 2,135,230.52 | 2,213,440.45 | 26,512,747.04 |
| Net Ordinary Income | -373,172.56 | -303,856.25 | -105,437.18 | -5,730,199.37 |
| Net Income | -373,172.56 | -303,856.25 | -105,437.18 | -5,730,199.37 |

**EXHIBIT 3**

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | $2,108,333 | $2,347,917 | $2,493,943 | $2,594,739 | $2,664,241 | $2,810,330 | $2,904,951 | $3,066,337 | $3,217,136 | $3,338,461 | $3,445,659 | $3,523,420 | $34,515,467 |
| Operations Comp. - Base | 802,864 | 802,864 | 804,633 | 807,555 | 807,555 | 807,555 | 810,137 | 810,783 | 814,291 | 816,321 | 816,321 | 816,321 | 9,711,230 |
| Operation Comp. - Growth | 35,384 | 35,384 | 70,767 | 120,597 | 129,211 | 129,211 | 180,853 | 193,771 | 193,771 | 263,933 | 304,539 | 304,539 | 1,961,958 |
| Payroll Taxes | 93,619 | 79,364 | 67,737 | 66,429 | 61,508 | 70,726 | 73,341 | 76,508 | 76,242 | 80,614 | 82,902 | 107,816 | 936,807 |
| Employee Benefits | 77,116 | 77,116 | 80,534 | 85,348 | 86,180 | 86,180 | 91,168 | 92,416 | 92,416 | 99,194 | 103,116 | 103,116 | 1,073,901 |
| Direct Operational Expenses | 246,985 | 272,135 | 287,464 | 300,045 | 307,340 | 322,676 | 314,424 | 330,355 | 345,240 | 357,217 | 367,799 | 375,475 | 3,827,154 |
| | $1,255,968 | $1,266,863 | $1,311,135 | $1,379,542 | $1,391,794 | $1,416,348 | $1,469,922 | $1,503,832 | $1,518,452 | $1,615,249 | $1,674,677 | $1,707,267 | $17,511,049 |
| Gross Profit | $852,366 | $1,081,054 | $1,182,808 | $1,215,197 | $1,272,446 | $1,393,982 | $1,435,029 | $1,562,505 | $1,698,684 | $1,723,212 | $1,770,982 | $1,816,154 | $17,004,418 |
| | 40.4% | 46.0% | 47.4% | 46.8% | 47.8% | 49.6% | 49.4% | 51.0% | 52.8% | 51.6% | 51.4% | 51.5% | 49.3% |
| S,G&A Compensation | 374,606 | 374,897 | 374,897 | 377,397 | 377,689 | 377,689 | 379,689 | 379,939 | 379,939 | 382,964 | 382,964 | 382,964 | 4,545,636 |
| S,G&A Comp. - Growth | 53,293 | 59,127 | 59,127 | 59,127 | 64,960 | 64,960 | 49,950 | 54,960 | 54,960 | 54,960 | 54,960 | 54,960 | 685,353 |
| Raises - all departments | | | | | | | 21,454 | 21,454 | 21,454 | 21,454 | 21,454 | 21,454 | 128,724 |
| Payroll Taxes | 47,790 | 41,093 | 33,584 | 31,257 | 29,064 | 33,420 | 33,385 | 34,757 | 34,636 | 34,346 | 33,977 | 44,188 | 431,496 |
| Employee Benefits | 36,728 | 37,292 | 37,292 | 37,292 | 37,855 | 37,855 | 36,406 | 36,889 | 36,889 | 36,889 | 36,889 | 36,889 | 445,167 |
| Bank Fees | 14,500 | 11,000 | 11,110 | 5,703 | 5,760 | 5,818 | 5,876 | 5,935 | 5,994 | 6,054 | 6,115 | 6,176 | 90,042 |
| Closing Fee - new facility | | | | 27,778 | 27,778 | 27,778 | 27,778 | 27,778 | 27,778 | 27,778 | 27,778 | 27,778 | 250,000 |
| Insurance | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 44,583 | 535,000 |
| Professional Fees | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 35,267 | 423,200 |
| Office Expenses | 42,167 | 46,958 | 49,879 | 51,895 | 53,285 | 56,207 | 58,099 | 61,327 | 64,343 | 66,769 | 68,913 | 70,468 | 690,309 |
| Rent | 57,947 | 57,947 | 57,947 | 60,947 | 60,947 | 60,947 | 60,947 | 60,947 | 60,947 | 60,947 | 60,947 | 60,947 | 722,360 |
| Computer & Internet | 46,454 | 46,454 | 46,454 | 51,796 | 51,796 | 51,796 | 56,976 | 56,976 | 56,976 | 64,098 | 64,098 | 64,098 | 657,973 |
| Telephone | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 32,000 | 38,400 | 38,400 | 38,400 | 38,400 | 38,400 | 38,400 | 422,400 |
| Non-Logistics Reimbursements | 41,000 | 41,820 | 42,656 | 43,510 | 44,380 | 45,267 | 46,173 | 47,096 | 48,038 | 48,999 | 49,979 | 50,978 | 549,896 |
| Other Admin Expenses | 67,706 | 67,827 | 68,283 | 70,980 | 71,116 | 71,374 | 75,424 | 75,776 | 75,936 | 76,418 | 77,026 | 77,366 | 875,232 |
| EBITDA/Income from Operations | $(41,675) | $184,788 | $289,729 | $285,665 | $335,966 | $449,020 | $464,613 | $580,422 | $712,545 | $723,287 | $767,632 | $799,637 | $5,551,629 |
| | -2.0% | 7.9% | 11.6% | 11.0% | 12.6% | 16.0% | 16.0% | 18.9% | 22.1% | 21.7% | 22.3% | 22.7% | 16.1% |
| Mortgage Interest | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 168,000 |
| Bank Interest | 268,698 | 268,698 | 268,698 | 112,896 | 112,896 | 112,896 | 118,313 | 118,313 | 118,313 | 123,729 | 123,729 | 123,729 | 1,870,906 |
| Bond Interest | | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 605,000 |
| Depreciation | 35,000 | 36,042 | 36,042 | 36,042 | 36,042 | 36,042 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 | 37,083 | 437,708 |
| Net Income from Operations | $(359,372) | $(188,951) | $(84,010) | $67,728 | $118,028 | $231,083 | $240,217 | $356,026 | $488,149 | $493,474 | $537,819 | $569,825 | $2,470,014 |
| Gain on Extinguishment of Debt | | | | 2,639,000 | | | | | | | | | 2,639,000 |
| Net Income before Income Taxes | $(359,372) | $(188,951) | $(84,010) | $2,706,728 | $118,028 | $231,083 | $240,217 | $356,026 | $488,149 | $493,474 | $537,819 | $569,825 | $5,109,014 |

**EXHIBIT 4**

# MCF ACCOUNT ASSIGNMENT AND SECURITY AGREEMENT

This Account Assignment and Security Agreement (the "Agreement") is dated this 11th day of January, 2017, and is between Marquette Commercial Finance, a division of Marquette Transportation Finance, LLC, a Missouri limited liability company ("MCF"), and Document Processing Solutions, Inc., a California corporation ("Assignor").  This Agreement shall become effective as of the day it is accepted in the State of Minnesota by MCF as indicated at the end hereof by the date and signature on behalf of MCF.

## SECTION 1 - DEFINITIONS

1.01    **Definitions**.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: the terms defined in this Section have the meanings assigned to them in this Article, and include the plural as well as the singular; and all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles ("GAAP").

"**Account**" shall mean all of Assignor's accounts, as the term is defined in the Uniform Commercial Code in Minnesota, however created or evidenced arising from the rendition of services or sale of inventory by Assignor together with all contract rights, instruments, documents, chattel paper, notes, drafts and other forms of obligations owing to Assignor related to or evidencing any account.

"**Advance**" means the Initial Payment and any advance by MCF to the Assignor pursuant to Section 2 hereof.  The Advances may be up to eight-five percent (85%) of the Gross Amount of a Qualified Account; in MCF's sole discretion, however, the Reserve shall not be less than fifteen percent (15%) of the Qualified Accounts.

"**Account Debtor**" shall mean any person or entity liable to Assignor relating to any Account.

"**Base Rate**" means, on any day, the greater of (i) the rate per annum published from time to time by The Wall Street Journal or www.wsj.com as the base or prime rate for corporate loans at large commercial banks (or if more than one such rate is published for any day, the higher or highest of the rates so published) or (ii) the sum of the three-month London interbank offered rate ("LIBOR") published from time to time by The Wall Street Journal or www.wsj.com plus two percent (2%).  If either the prime rate or three-month LIBOR is no longer published by The Wall Street Journal or www.wsj.com, then MCF shall, in its sole and absolute discretion, substitute another published or announced prime rate or three-month LIBOR Rate, as the case may be.

"**Collateral**" shall mean all present and future Accounts, all of Assignor's other Accounts; chattel paper, instruments, payment intangibles, general intangibles, and documents whether or not considered an Account under the terms of this Agreement; all assets including, without limitation, records, inventory, equipment of every kind and description; furniture and fixtures; deposit Accounts; money; investment property; letters of credit; notes; the Reserve; tax refunds and insurance proceeds, all as defined herein or in the Uniform Commercial Code and all proceeds thereof.

"**Default Base Rate**" means, upon the occurrence of an Event of Default, for each day the Event of Default is not cured, the greater of (i) the rate per annum published from time to time by The Wall Street Journal or www.wsj.com as the base or prime rate for corporate loans at large commercial banks (or if more than one such rate is published for any day, the higher or highest of the rates so published) or (ii) the sum of the three-month London interbank offered rate ("LIBOR") published from time to time by The

Wall Street Journal or www.wsj.com plus five percent (5%). If either the prime rate or three-month LIBOR is no longer published by The Wall Street Journal or www.wsj.com, then MCF shall, in its sole and absolute discretion, substitute another published or announced prime rate or three-month LIBOR Rate, as the case may be.

"**Effective Date**" shall mean the date MCF accepts this Agreement at its offices in Bloomington, Minnesota.

"**Fee Schedule**" shall mean the fees and charges set forth on Schedule A.

"**Fixed Discount**" A Fixed Discount shall mean a percentage of the Gross Amount of each of the Accounts assigned to MCF pursuant to this Agreement. The discount is computed on the Gross Amount of an Account based on the actual days elapsed from the date of the Initial Payment for the Account until after the proceeds of collection for the Account are received and deposited by MCF. The percentages for this Agreement of the Fixed Discounts are set forth on Schedule A.

"**Gross Amount**" of an Account means the gross face amount payable pursuant to the related invoice.

"**Initial Payment**" means up to eighty-five percent (85%) of the Gross Amount of an Account; provided, however, the Reserve shall not be less than fifteen percent (15%) of the Qualified Accounts.

"**Maximum Amount**" shall mean Twelve Million Dollars and No Cents ($12,000,000.00).

"**Obligations**" shall mean and refer to all of Assignor's obligations under this Agreement as well as all amounts MCF may from time to time advance to Assignor and to others at the request of or for the account of or for the benefit of Assignor, all other debts, extensions of credit, liabilities and obligations of Assignor to MCF or any affiliate of every kind and description (whether or not evidenced by a note or other instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, joint or several, primary or secondary, due or to become due, now existing or hereafter arising, including, without limiting the generality of the foregoing, any liability of Assignor to MCF or any affiliate as a guarantor of indebtedness or liabilities of others and all interest, fees, charges and expenses payable by Assignor hereunder, or any supplement or amendment hereto or any other agreement between Assignor or MCF or any affiliate or any instrument evidencing any of the foregoing.

"**Qualified Account**" shall have the meaning set forth in Section 4.03, hereof.

"**Reserve**" shall mean a ledger entry representing the difference between the face value of the Qualified Accounts assigned to MCF and the funds advanced to Assignor and is not represented by any deposit fund excepting thereof the value of any letter of credit, certificate of deposit or cash deposit in lieu of a Reserve.

"**Remittance Address**" shall mean NW 6333, P.O. Box 1450, Minneapolis, MN 55485-6333 (or, upon notice from MCF, another post office box of MCF) and, in the case of payments to be effected by wire transfer or other electronic means, the related invoice must set forth, as the sole bank account for all payments, a bank account of MCF (or a third party designated by MCF) designated by MCF from time to time (except in each case as otherwise agreed in writing by MCF).

000018

"**Termination Date**" shall mean the date this Agreement is terminated by one of the parties.

"**Variable Discount**" shall mean the amount computed on the amount of the Initial Payment and any future Advance and accruing on the basis of actual days elapsed from the date of Initial Payment or any Advance and until and including three business days after MCF receives and deposits the full amount of the Account at a per annum rate equal to (based on a year consisting of 360 days) the Base Rate plus two percent (2.00%) per annum; provided, however, in no event shall the Variable Discount with respect to any Account assigned hereunder be less than five percent (5.00%) per annum.

## SECTION 2 - ASSIGNMENT OF ACCOUNTS

2.01    **Offer of Accounts**.  At its election from time to time during the term of this Agreement, Assignor agrees to offer for assignment to MCF certain of its Accounts arising out of sales of goods, or services rendered, by Assignor, and to assign to MCF on the terms set forth in this Agreement.  MCF shall have the absolute right in its sole discretion to reject any or all offered Accounts, whether or not MCF has previously accepted the assignment of Accounts of any particular Account Debtor hereunder.  Without the prior written consent of MCF the parties agree the maximum of amount of advances for Qualified Accounts at any time then remain outstanding will not exceed the Maximum Amount, provided, however, if MCF makes  an over-advance in excess of the Maximum Amount then, all of the excess over-advance will continue to be governed by this Agreement.

2.02    **Assignment of Accounts**.  Each Account assigned to MCF hereunder shall be made by MCF with recourse against Assignor.  In connection with each assignment of Accounts to MCF, Assignor agrees to deliver to MCF a written assignment of the Accounts, together with a copy of all invoices relating to the Accounts, and evidence of delivery of the related goods or performance of the related services (and, if requested, the original purchase orders from the applicable customers), all in a form satisfactory to MCF.  In order for an Account to be Qualified Account eligible for assignment to MCF, the related invoice must set forth the Remittance Address as the sole address for payment of the Account.  MCF's acceptance for assignment of offered Accounts shall be evidenced by MCF's tendering of the Initial Payment and any subsequent Advance subject to the maintenance of the Reserve to Assignor or otherwise delivering to Assignor a schedule of Accounts accepted for assignment by MCF.

2.03    **Security Interest**.  Assignor hereby grants to MCF a security interest in the Collateral.  The foregoing conveyance does not constitute and is not intended to result in an assumption by MCF of any obligation of Assignor or any other person in connection with the Accounts or related rights or under any agreement or instrument relating thereto.  Assignor agrees to execute and deliver the bills of sale, assignments, letters of credit, notices of assignment, financing statements (including continuation statements) under the applicable UCC and other documents, and make entries and markings in its books and records, and to take all other actions (including the negotiation, assignment or transfer of negotiable documents, letters of credit or other instruments) as MCF may request to further evidence or protect the sales and assignments of Accounts and related rights to MCF.

2.04    **Terms of Accounts**.  Except as otherwise may be agreed to in writing by MCF from time to time, the terms of assignment offered by Assignor to its Account Debtors with respect to all Accounts offered to MCF hereunder shall be  the number of days specified on the invoice for the offered Account, but in no event greater than Net 30 Days.  After an Account has been assigned to MCF, Assignor shall not have the right to vary the terms of sale set forth in the invoice relating to the Account, or any other aspect of the Account.

## SECTION 3 - PRICING AND RESERVE

000019

3.01    **Reserve**.  Assignor shall establish an initial Reserve upon commencement of the use of the services and facilities of MCF.  The initial Reserve may be adjusted up or down at any time in the sole discretion of MCF.  If upon adjustment it is found that Assignor does not have a Reserve with MCF in the amount required, Assignor shall immediately pay the deficit to MCF.  If the deficit is not paid by Assignor, the amount of any deficit may be deducted by MCF from the remittances due Assignor. Assignor will be charged interest on the deficit of the Reserve equal to the Base Rate, plus 5% per annum until the Reserve is fully funded.

3.02    **Charges**.  The charges for the amounts advanced by MCF and services provided by MCF shall be pursuant to the applicable Fee Schedule in effect at the time the Accounts are assigned to MCF.  The current Fee Schedule is attached as Schedule A and incorporated herein by reference.  It is expressly understood that the charges and the applicable Fee Schedule may be increased or decreased by MCF at any time upon thirty (30) days written notice to Assignor and that the changes shall be and become a part of this Agreement at the end of said thirty (30) day period as though set forth verbatim herein. Deductions from remittances to the Assignor may be made by MCF for the charges made pursuant to the applicable Fee Schedule, as well as for all Obligations of all kinds of the Assignor to MCF and to maintain the Reserve.

3.03    **Commitment Fee**.  Assignor hereby agrees to pay to MCF on the execution hereof a one-time commitment fee (the "Commitment Fee") of Zero and No/100 Dollars ($0.00).  Assignor and MCF acknowledge and agree that the Commitment Fee is intended as reasonable compensation to MCF for entering into this Agreement.

3.04    **UCC Filings**.  Assignor hereby authorizes MCF to file in any jurisdiction MCF may deem appropriate, without the signature of Assignor, one or more financing statements, and all amendments and continuations with respect thereto, relating to the Collateral and hereby ratifies, confirms and consents to any filings made by MCF prior to the date hereof.  Assignor further agrees that a carbon, photographic or other reproduction of this Agreement or any financing statement describing any Collateral is sufficient as a financing statement and may be filed in any jurisdiction MCF may deem appropriate.

3.05    **Documentation**.  Assignor will furnish to MCF, upon request, any and all papers, documents, electronic records, and other records in its possession or control related to any Account assigned to MCF or related to Assignor's business and agrees to cooperate fully with MCF in all matters related to collection of the Accounts.  In the event MCF is unable to match a specific payment to an outstanding Account of Assignor, MCF shall provide both the Assignor and the Account debtor a 90 day notice requesting information to match the payment to an Account   The notice shall be in writing and clearly indicate it is a request for identification of the payment. The notice shall include: 1) the check number: 2) the amount, and date of the payment; 3) the payor's name; and 4) any additional basic information MCF is able to provide. Concerning the payment, MCF shall retain the payment pending receipt of documentation to match the payment to a specific Account.  Upon receipt of the information from the Assignor matching the Account to the payment, MCF shall apply the payment to the Account.  In the event the Account debtor provides written notice the payment was made in error, MCF shall return the payment to the Account debtor.  In the event neither Assignor or Account debtor provides documentation necessary to apply the amount to an Account, MCF shall retain the payment as general income to MCF, subject to disgorgement as provided under applicable law; provided that the amount of such payment shall be applied under the terms of this Agreement to reduce the amount of the Obligations.

3.06    **Disputed Accounts**.  Assignor agrees to notify MCF immediately of any breach by Assignor of any representation, warranty or agreement of Assignor contained herein or should any representation, warranty or agreement made herein become untrue or false at any time.  Assignor further agrees to notify

000020

MCF immediately of the assertion by any Account Debtor of any dispute or other claim (including any defense or offset asserted by any Account Debtor) with respect to any Account assigned to MCF hereunder, or with respect to any related goods or services ("Disputed Accounts"). Unless MCF is advised in writing by Assignor to the contrary, any Account that: (i) has not been paid by the Account Debtor within ninety (90) days from the date of the invoice upon which the Account is based, or (ii) when MCF determines, in its sole discretion, an Account is uncollectable the Account shall become a Disputed Account. As to any Disputed Account, MCF shall have the right, in its sole discretion, (i) to settle at the expense of Assignor (including all attorneys' fees and expenses of MCF) and for the benefit of MCF any dispute or claim upon the terms as MCF may, in its sole discretion, deem advisable or (ii) to charge the Gross Amount of the Disputed Account against the Reserve or deduct the unpaid balance from any Initial Payment, any Advance or against any money or other funds of Assignor in the possession, custody or control of MCF, from whatever source.

   3.07    **Payments; Timing of Application**.  Payments received by MCF after 2:00 PM central time (Standard or Daylight as applicable) on each business day will be applied against Assignor's Obligations hereunder on the following business day.

**SECTION 4 - WARRANTIES AND REPRESENTATIONS**

   4.01    **Notification and Collection**.  Assignor authorizes MCF to forward directly to Account Debtors statements or invoices on Accounts assigned to MCF hereunder, and to request payment at the address or to the bank account as may be designated by MCF.  Assignor agrees that, if any payment is made to Assignor on any Account assigned to MCF from Assignor hereunder, Assignor (i) will hold the payment in trust for MCF, (ii) will not commingle any payment with any funds of Assignor, and (iii) will deliver all payments to MCF, in the exact form received, by the close of business on the next business day following receipt thereof by Assignor.  Assignor shall direct all Account Debtors on all Accounts to remit all payments directly to the Remittance Address, whether any Account is assigned to MCF or not.  If any payment on any Accounts is received by Assignor (rather than sent to the Authorized Remittance Address), Assignor shall give prompt notice thereof to MCF.  Without limiting the other rights and remedies of MCF under this Agreement or otherwise, Assignor's failure to strictly comply with this Section 4.01 shall constitute an immediate breach of and default under this Agreement, entitling MCF (in MCF's sole discretion) to immediately terminate this Agreement.

   4.02    **Power of Attorney**.  Assignor authorizes MCF to collect, sue for and give releases for and in the name of Assignor, in the sole discretion of MCF.  Assignor appoints MCF or any other person whom MCF may from time to time designate, as Assignor's attorney in fact with power to: (i) endorse Assignor's name on any checks, drafts or other forms of payment or security that may come into MCF's possession; (ii) sign Assignor's name on notices of assignment, financing statements and amendments under the Uniform Commercial Code, on verifications of Accounts and on notices to debtors; (iii) receive, open and dispose of all mail addressed to Assignor at MCF's address; (iv) send requests for verification of Accounts to a debtor; and (v) do all things necessary to carry out this Agreement.  Assignor hereby ratifies and approves all acts of MCF.  MCF shall not be liable to Assignor for any acts of commission or omission nor for any error in judgment or mistake of fact or law except for MCF's gross negligence or willful misconduct.  This power, being coupled with an interest, is irrevocable so long as any Account in which MCF has a security interest is unpaid or any obligation from Assignor to MCF remains unpaid.

   4.03    **Qualified Accounts**.  In order to qualify as a Qualified Account each Account tendered to MCF shall have all of the following attributes:

   (i)        Assignor is the sole owner of each Account;

5

(ii)    Other than the lien in favor of Agility Capital II, LLC (the "Agility Lien"), which shall be subordinate to the lien of MCF, each Account is free and clear of any liens, claims, equities or encumbrances whatsoever except in favor of MCF, and upon each assignment to MCF of each Account, MCF will own the Account free and clear of any liens, claims, equities or encumbrances whatsoever and the consideration received by Assignor from MCF for the Account is fair and adequate;

(iii)    The title to Assignor's Account is absolute and is not subject to any prior assignment, claim, lien or security interest;

(iv)    The amount shown on the books of the Assignor and on a copy or schedule of any Accounts or statements delivered to MCF is owing to the Assignor, and no partial payment for which full credit has not been reflected has been made thereon by anyone;

(v)    The Account is not subject to any known:  (a) claim of reduction, counterclaim, setoff, recoupment, or (b) any claim for credits, allowances or adjustments by the Account Debtor because of damaged goods or unsatisfactory services, or for any other reason;

(vi)    The Account is due and payable not more than ninety (90) days from the date of the invoice therefor;

(vii)    The Account has not been outstanding more than ninety (90) days past the date of the original invoice (If twenty percent (20.0%) or more of the receivables of any customer of Assignor has been outstanding more than ninety (90) days past the date of the original invoice, the entire Account of such customer shall be deemed to be outstanding more than ninety (90) days past the date of the original invoice):

(viii)    The Account does not arise out of a contract with, or order from an Account Debtor that, by its terms, forbids or makes the assignment of that Account to MCF void or unenforceable;

(ix)    The Assignor has not received any note, trade acceptance, draft or other instrument with respect to or in payment of the account, or any chattel paper with respect to the goods giving rise to the Account, and, if any instrument or chattel paper is received, the Assignor will immediately notify the MCF and, at MCF's request, endorse or assign and deliver the same to MCF;

(x)    Neither Assignor nor MCF has any notice of anything which might, in MCF's sole judgment, impair the credit standing of the Account Debtor;

(xi)    The Account Debtor is not an affiliate of the Assignor;

(xii)    Neither the Account nor the Account Debtor have been placed on MCF's non-assignment list;

(xiii)    Assignor is the sole obligee under all Accounts, and has full power and is duly authorized to assign the Accounts to MCF hereunder, and the date of assignment of the Account is not more than 30 days after the date of the original invoice relating to each Account;

(xiv)    All Accounts arise out of a bona fide sale of conforming goods or the bona fide rendition of services by Assignor, and all underlying goods have been delivered to the Account Debtor, or all underlying services have been rendered by Assignor, in complete fulfillment of all of the

6

terms and conditions of a fully executed, delivered and unexpired contract with the Account Debtor, and the Account Debtor has accepted the goods or services to which the Account relates;

(xv)    Each Account is denominated and payable only in United States dollars and constitutes the legal, valid and binding payment obligation of the Account Debtor, enforceable in accordance with its terms (except as the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally);

(xvi)    Each Account is current and not past due as of the date of the assignment to MCF, has not been paid by or on behalf of the Account Debtor in whole or in part, and is not and will not be subject to any dispute, rescission, set-off, recoupment, defense or claim by the Account Debtor, whether relating to price, quality, quantity, workmanship, delay in delivery, set off, counterclaim or otherwise, and the Account Debtor has not and will not claim any defense of any kind or character (other than bankruptcy or insolvency arising after the date of sale of the Account to MCF hereunder) against payment of the Account; and

(xvii)    Assignor has paid all applicable taxes and governmental charges of any kind imposed with respect to the sale of goods or the rendering of services relating to Accounts assigned to MCF.

4.04    **Assignor Representations and Warranties**.  Assignor further represents and warrants to MCF that:

(i)    The execution, delivery and performance of this Agreement by Assignor have been duly authorized and this Agreement constitutes the legal, valid and binding obligation of Assignor, enforceable against Assignor in accordance with its terms (except as the enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally);

(ii)    All Accounts tendered to MCF will be Qualified Accounts;

(iii)    Assignor is not a debtor in any bankruptcy proceedings, insolvent, undergoing composition or adjustment of debts or unable to make payment of its obligations when due and no petition in bankruptcy has been filed by or against Assignor or any Affiliate, nor has Assignor or any Affiliate filed any petition seeking an adjustment of its debts or for any other relief under the Bankruptcy Code, and no application for appointment of a receiver or trustee for all or a substantial part of the property of Assignor or any Affiliate is pending, nor has Assignor or any Affiliate made any assignment for the benefit of creditors;

(iv)    Assignor is not in default of any debt or obligation to MCF, or other creditor;

(v)    this Agreement is entered into for a legitimate business purpose; and

(vi)    Assignor is organized under the laws of the State of California.

Each representation and warranty of Assignor contained in this Agreement shall be deemed to be made at and as of the date hereof and at and as of the date of each sale of Accounts to MCF hereunder.

**SECTION 5 - FINANCIAL COVENANTS**

000023

5.01    **Financial Statements**.  Assignor represents and warrants that all financial and other information provided by Assignor to MCF in connection with or in Assignor's application to MCF or to induce MCF to enter into this Agreement is true, complete and correct in all material respects.  Assignor agrees to furnish to MCF (i) within 90 days after the last day of each fiscal year of Assignor, a consolidated statement of income and a consolidated statement of cash flows of Assignor for each fiscal year, and a consolidated balance sheet of Assignor as of the last day of each fiscal year, together with a copy of any report to management delivered to Assignor by its accountants in connection therewith, and (ii) within 30 days after the last day of each fiscal quarter of Assignor, an unaudited consolidated statement of income and statement of cash flows of Assignor for each fiscal quarter, and an unaudited consolidated balance sheet of Assignor as of the last day of each fiscal quarter.  Assignor represents and warrants that each statement of income and statement of cash flows will fairly present, in all material respects, the results of operations and cash flows of Assignor for the period set forth therein, and that each balance sheet will fairly present, in all material respects, the financial condition of Assignor as of the date set forth therein, all in accordance with GAAP applied on a consistent basis, except as otherwise noted in the accompanying auditors' report (or, with respect to unaudited financial statements, in the notes thereto). Assignor also agrees to furnish to MCF, upon request, additional financial and business information concerning Assignor and its business as MCF may reasonably request. Assignor agrees to provide: (i) its annual corporate tax return, (ii) its accounts payable aging within 10 business days after the end of each month, and (iii) its account receivable aging within 10 business days after the end of each month.  MCF and its agents, representatives and accountants shall have the right, at all times during normal business hours and with prior notice to Assignor, to conduct an audit or other examination of the financial and business records of Assignor and to examine and make copies of all books and records of Assignor for the purpose of assuring or verifying compliance by Assignor with the terms of this agreement, and Assignor agrees to cooperate fully with MCF and its agents, representatives and accountants in connection therewith and to timely pay all costs associated with each audit at a rate equal to $1,000.00 per day, per person, plus out-of-pocket expenses.  In no event shall the costs and expenses in connection with any one audit exceed the amount of $7,500.00.  MCF shall have the right to conduct such audits one time in any twelve (12) month period during the term of this Agreement, or at any time during which an Event of Default exists under the terms of this Agreement. If an event of default exits, the $7,500.00 audit expense cap is no longer in effect.  Assignor also specifically agrees to immediately notify MCF of any material adverse change in Assignor's financial condition or business.

## SECTION 6 - EVENTS OF DEFAULTS AND REMEDIES

6.01    **Events of Default**.  "Events of Default," wherever used herein, means any one of the following events:

(i)    Default in the payment of any Obligation due hereunder when it becomes due and payable or default in payment of Obligation due to MCF when it becomes due and payable;

(ii)    Any representation or warranty made by the Assignor in this Agreement or by the Assignor (or any of its officers) in any certificate, instrument, or statement contemplated by or made or delivered pursuant to or in connection with this Agreement, shall prove to have been incorrect in any material respect when made;

(iii)    Default in the performance, or breach, of any covenant or agreement of the Assignor in this Agreement;

000024

(iv)    The Assignor or any Guarantor shall be adjudicated a bankrupt or insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors; or the Assignor or any Guarantor shall apply for or consent to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property; or a receiver, trustee or similar officer shall be appointed without the application or consent of the Assignor or any Guarantor and the appointment shall continue for a period of thirty (30) days; or a petition shall be filed by the Assignor or any Guarantor under the United States Bankruptcy Code naming the Assignor or any Guarantor as debtor thereunder or any petition shall be filed against the Assignor or any Guarantor and shall remain pending for a period of thirty (30) days; or any judgment, writ, warrant of attachment or execution or similar process shall be issued or levied against a substantial part of the property of the Assignor or any Guarantor and the judgment, writ, or similar process shall not be released, vacated or fully bonded within thirty (30) days after its issue or levy;

(v)    The rendering against the Assignor or any Guarantor of a final judgment, decree or order for the payment of money in excess of Fifty Thousand Dollars ($50,000.00) and the continuance of the judgment, decree or order unsatisfied and in effect for any period of thirty (30) consecutive days without a stay of execution;

(vi)    Assignor shall sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any other Person, without obtaining the prior written consent of MCF, which consent shall not be unreasonably withheld or delayed;

(vii)    Assignor shall consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person, without obtaining the prior written consent of MCF, which consent shall not be unreasonably withheld or delayed;

(viii)    Assignor suspends operations as presently conducted, or discontinues doing business as an ongoing concern;

(ix)    Assignor engages in any line of business materially different from what it presently is engaged in by the Assignor;

(x)    Legal, beneficial, or equitable ownership of Assignor shall be changed by sale, conveyance, transfer, assignment, or encumbrance without the prior written consent of MCF, which consent shall not be unreasonably withheld or delayed;

(xi)    Any Guarantor shall sell, transfer, convey, assign or otherwise dispose of any of his/her or its shares of stock in the Assignor (whether in one transaction or a series of transactions and whether voluntarily or involuntarily), without obtaining the prior written consent of MCF, which consent shall not be unreasonably withheld or delayed;

(xii)    Any lien or encumbrance shall be filed against Assignor, or any of the Collateral, other than the Agility Lien;

(xiii)    The filing of any local, state or federal tax lien against Assignor;

9

000025

(xiv)   The failure to immediately remit to MCF any payments for any Accounts received by Assignor; and

(xv)    Any attempts by Assignor, other than as specifically requested by MCF, to collect Accounts from Account Debtors.

6.02   **Rights and Remedies**.  Upon the occurrence of an Event of Default or at any time thereafter until the Event of Default is cured to the written satisfaction of MCF, MCF may exercise any or all of the following rights and remedies:

(i)     MCF may, by notice to the Assignor, declare this Agreement to be terminated, whereupon the same shall forthwith terminate;

(ii)    The Base Rate shall be increased to the Default Base Rate until the Event of Default is Cured;

(iii)   MCF may, by notice to the Assignor, declare the entire unpaid amount of all Obligations then outstanding, all interest accrued and unpaid thereon, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon this Agreement, all accrued interest and all the amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Assignor.

(iv)    MCF may, without notice to the Assignor and without further action, apply any and all money owing by MCF to the Assignor to the payment of any Obligation then outstanding and all other sums then owing by the Assignor hereunder, all in the order as MCF shall determine; and

(v)     MCF may exercise and enforce its rights and remedies under this Agreement or under the Uniform Commercial Code in effect in Minnesota or the jurisdiction where the Collateral is located.

## SECTION 7 - TERM AND TERMINATION

7.01   **Term**.  Unless terminated sooner, this Agreement shall continue for an initial period of three (3) years from the Effective Date (the "Initial Term") and shall be automatically renewed for successive periods of one (1) year (each a "Renewal Term"), unless sooner terminated as hereinafter provided.  If for any reason this Agreement is terminated by Assignor, or if this Agreement is terminated by MCF due to an Event of Default hereunder, prior to the end of the Initial Term or any Renewal Term, and in view of the impracticality, the extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of MCF's lost profits as a result thereof, Assignor agrees to pay MCF, upon the effective date of such termination, a termination fee in the amount set forth below: (i) three percent (3%) of the Maximum Amount during the Initial Term; (ii) two percent (2%) of the Maximum Amount during the first Renewal Term; (iii) one percent (1%) of the Maximum Amount during the second Renewal Term.  The termination fee shall be presumed to be the amount of damages sustained by MCF as a result of such early termination and Assignor agrees that it is reasonable under the circumstances currently existing.  No termination fee shall be payable upon a termination of this Agreement by MCF for a reason other than the occurrence of an Event of Default by Assignor.

7.02   **Termination**.  This Agreement may be terminated by either party hereto by delivery of written notice of termination of this Agreement to the other party specifying the date of termination.  A notice of

10

termination sent by Assignor shall be effective at the expiration of sixty (60) days from the date the notice of the termination is sent to MCF.  A notice of termination sent by MCF shall be effective at the expiration of thirty (30) days from the date the notice of the termination is sent to Assignor.  MCF may, at its election, terminate this Agreement immediately and without the requirement of notice to Assignor if:

(i)      Assignor shall fail to perform any of its obligations hereunder or shall breach any of its representations and warranties hereunder;

(ii)     Assignor or any of its Affiliates shall become insolvent or suspend all or a substantial part of its or their business;

(iii)    A petition under the Bankruptcy Code or any other insolvency or debtor statute shall be filed by or against Assignor or any Affiliate or any receivership proceedings with respect thereto shall commence;

(iv)     Any guarantee of any of Assignor's obligations hereunder shall be terminated or become impaired;

(v)      An event of default occurs under any other agreement now or hereafter executed between Assignor and MCF, or

(vi)     MCF otherwise determines that it is insecure hereunder.

Termination of this Agreement shall not affect the rights and obligations of the parties hereunder with respect to transactions occurring on or prior to the date of the termination, and this Agreement shall continue to govern the rights and obligations of the parties hereto with respect to Accounts assigned to MCF from Assignor on or prior to the date of the termination.  All security interests granted or contemplated by this Agreement shall survive the termination of this Agreement until all amounts payable to MCF with respect to transactions occurring on or prior to the date of termination have been paid to MCF, and Assignor has performed all its obligations to MCF with respect to each transactions and all obligations under this Agreement including but not limited to payment of any fees owing hereunder.

## SECTION 8 - MISCELLANEOUS

8.01    **Attorney's Fees, Litigation Expense**.  Assignor agrees to reimburse MCF upon demand for MCF's attorneys' fees, court costs and other fees and expenses incurred in collecting any sums due or to become due to MCF hereunder, enforcing and/or defending any of MCF's rights under this Agreement or in connection with the assigned Accounts and all actions taken by MCF that it deems necessary or desirable under the Bankruptcy Code or applicable law or should any provisions of the Bankruptcy Code be applicable to any rights or obligations of any party to this Agreement, as well as all appearances, motions and actions to which MCF may be or become a party in any bankruptcy case.

8.02    **Choice of Law.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Minnesota without regard to conflicts of law with other jurisdictions.

8.03    **Jurisdiction**.  Assignor agrees that the state and federal courts sitting in the State of Minnesota shall have exclusive jurisdiction to hear and determine any claims or disputes between the Assignor and MCF pertaining directly or indirectly to this Agreement, the indebtedness evidenced hereby, or to any matter arising therefrom and Assignor hereby waives any objection to the inconvenient forum.

000027

8.04    **Waiver of Trial by Jury**.  The Assignor and MCF each waives any right to a TRIAL BY JURY in any action to hear and determine any claims or disputes between Assignor and MCF pertaining directly or indirectly to this Agreement, the indebtedness evidenced hereby, or to any matter arising therefrom and Assignor agrees that any action or proceeding shall be tried before a Court and not before a Jury.

8.05    **Severability of Provisions**.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent the prohibition or unenforceability without invalidating the remaining provisions hereof.

8.06    **Amendments; Waivers**.  This Agreement may be amended only in writing signed by the parties hereto.  No failure on the part of MCF to exercise, and no delay by MCF in exercising, and no course of dealing by MCF with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder by MCF preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies of MCF hereunder are cumulative and not exclusive of any remedies provided by law.

8.07    **Addresses for Notices, Etc**.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for hereunder shall be in writing and mailed or delivered to the applicable party at its address indicated below:

                         If to the Assignor:
Document Processing Solutions, Inc.
590 W. Lambert Road
Brea, California 92821

       If to MCF:
Marquette Commercial Finance
1600 West 82nd Street, Suite 250
Bloomington, MN, 55431

or, as to each party, at such other address as shall be designated by a party in a written notice to the other party complying as to delivery with the terms of this Section.  All notices, requests, demands and other communications shall, when mailed, be effective when deposited in the mails, addressed as aforesaid, except that notices or requests to MCF pursuant to any of the provisions of this Agreement shall not be effective until received by MCF.

8.08    **Indemnification**.  The term "Indemnified Persons" shall mean MCF and its officers, directors, shareholders, employees, attorneys, representatives, agents, Affiliates, successors and assigns.  Assignor agrees to indemnify, defend and hold the Indemnified Persons harmless from and against any and all loss, liability, obligation, damage, penalty, judgment, claim, deficiency and expense (including interest, penalties, attorneys' fees and amounts paid in settlement) owing to any third party to which any Indemnified Person may become subject arising out of or based upon this Agreement as well as any prior relationship of Assignor with any Indemnified Person, whether by alleged or actual negligence of any Indemnified Person, except and to the extent caused by the gross negligence or willful misconduct of any Indemnified Person.

8.09    **Waiver and Release**.  Assignor, by its execution of this Agreement, does hereby covenant, warrant and represent that (i) Assignor is not in default and no default exists under any prior agreements or transactions with MCF, (ii) Assignor releases, relinquishes and waives any and all defenses to the enforceability of any prior agreements or transactions with MCF in connection therewith to which Assignor may have otherwise been entitled as of the date hereof, (iii) Assignor relinquishes, waives and

000028

releases MCF from any and all claims known or unknown which Assignor may or might have against
MCF arising directly or indirectly out of or from any prior agreements or transactions between Assignor
and MCF, (iv) the benefit received and to be received by Assignor as a result of this Agreement shall and
does constitute sufficient and valuable consideration to Assignor for entering into and performing its
obligations under this Agreement, (v) the execution, delivery and performance by Assignor of this
Agreement and the consummation of the transaction contemplated thereby are (a) not prohibited by any
indenture, contract or agreement, law or corporate or partnership documents, including, but not limited to
the Bylaws and Articles of Incorporation or Certificate of Incorporation, as the case may be, if Assignor is
a corporation, or Assignor's partnership agreement, if Assignor is a partnership, (b) duly authorized by
appropriate action of Assignor, and (c) shall constitute a legally valid and binding obligations of Assignor
and enforceable against the Assignor according to their terms (except as the enforceability may be limited
by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the
enforcement of creditors' rights generally), (vi) that this Agreement will be executed and delivered by
properly authorized officers of Assignor, (vii) MCF has no obligation to continue the prior agreements or
enter into this Agreement except for the considerations herein expressed, and (viii) the representations
and warranties set forth herein will survive the execution and delivery of this Agreement.

8.10    **Captions; Final Agreement; Counterparts; Successors and Assigns**.  Captions and headings
appearing herein are included solely for convenience of reference and are not intended to affect the
interpretation of any provision of this Agreement.  This Agreement represents the final agreement
between the parties hereto with respect to the subject matter hereof, and supersedes all prior proposals,
negotiations, agreements and understandings, oral or written, related to the subject matter.  This
Agreement may be executed in any number of counterparts, all of which taken together shall constitute
one and the same instrument.  Delivery of an executed counterpart of this Agreement by telecopy shall be
equally as effective as delivery of a manually executed counterpart of this Agreement.  Any party
delivering an executed counterpart of this Agreement by telecopy also shall deliver a manually executed
counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect
the validity, enforceability, and binding effect of this Agreement.  This Agreement may not be assigned
by Assignor without the prior written consent of MCF.  This Agreement may be assigned by MCF, and
any Accounts assigned to MCF hereunder, together with all rights and interests related thereto granted to
MCF hereunder, may be assigned by MCF, all without notice to or the consent of Assignor.  This
Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

000029

8.11    **Miscellaneous Expenses**.  MCF shall be entitled to reimbursement upon demand for all out of pocket expenses incurred by MCF in the course of performing its functions or enforcing its rights with respect to this Agreement, including without limitation, the following:  lock box charges, long-distance telephone charges, postage, credit reports, wire transfers, insufficient funds charges, check copying charges, overnight mail delivery, UCC and tax lien searches, attorney's fees and filing fees.  Assignor hereby authorizes MCF, in MCF's sole discretion, to collect the expenses (i) by reducing the Initial Payment or any Advance; (ii) by adjusting the amount of the Reserve; (iii) debiting the Assignor's operating account; or (iv) by using any combination of the foregoing.  This authorization shall not affect Assignor's obligation to pay the sums to MCF on demand.

<u>Document Processing Solutions, Inc.</u>

By _____

Its _____

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA   )
                                       ) SS.
COUNTY OF _____          )

On _____ ___, 2016, before me, _____, notary public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____

**AGREED AND ACCEPTED**                    **Marquette Commercial Finance,**
this __ day of January, 2017              **a division of Marquette Transportation Finance, LLC**

By:  _____
Its:  ___ <u>Authorized Representative</u>

14

## SCHEDULE A
## FLAT RATE FEE SCHEDULE

1. **Amount of Fixed Discount.**  The amount of the Fixed Discount shall be as follows:

   | Days | Discount |
   |------|----------|
   | 1-30 | 0.20% |
   | 31-45 | 0.30% |
   | 46-60 | 0.40% |
   | 61-75 | 0.50% |
   | >76 | 0.60% |

2. **Variable Discount**.  The Base Rate plus two percent (2.00%) per annum; provided, however, in no event shall the Variable Discount with respect to any Account assigned hereunder be less than five percent (5.00%) per annum.

3. **Direct Collect Fee**.  Assignor shall be charged a direct collect fee of fifteen percent (15%) of the Gross Amount of any Account whenever the proceeds of an Account is paid to Assignor and the Account Proceeds are not remitted to MCF within three (3) business days from the receipt of the Account Proceeds.

4. **Service Charge Fee**.  Assignor hereby agrees to pay MCF a servicing fee on the first day of each calendar month equal to (i) $10,000.00 minus (ii) the total Fixed Discount and Variable Discount earned during the previous month (the "Servicing Fee"). Assignor hereby authorizes MCF, in MCF's sole discretion, to collect any amounts that are attributable to the Servicing Fee by (i) by reducing the Initial Payment or any Advance for any Account, (ii) debiting the Assignor's operating account, or (iv) using any combination of the foregoing.  The fee shall be paid to MCF so long as this Agreement is in effect.  Assignor and MCF acknowledge and agree that the Servicing Fee is intended as reasonable compensation to MCF for making this facility available under the terms of this Agreement and for no other purpose.

5. **Processing Fees**

   | Settlement by Wire Transfer | $35.00 per wire |
   |-----------------------------|-----------------|

15

## ACCOUNT COLLECTION AGREEMENT

This Agreement, dated as of January 11, 2017 by and between Marquette Commercial Finance, a division of Marquette Transportation Finance, LLC. ("MCF") and Document Processing Solutions, Inc. (the "Assignor").

## RECITALS

1.      The Assignor desires to use MCF's services to collect and process its accounts (the "Accounts").

2.      MCF and the Assignor have on this date executed an MCF Account Assignment and Security Agreement (the "Assignment Agreement") pursuant to which MCF agreed to make specified advances to the Assignor from time to time based on the amount of Qualified Accounts outstanding from time to time.[1]

3.      Pursuant to the Assignment Agreement, the Assignor has agreed to direct payment and collection of its Accounts to MCF.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein provided, the parties hereby agree as follows:

## ARTICLE I
### Performance of MCF's Services

Section 1.01  Assignment of Accounts.  As security under the Assignment Agreement and for the Assignor's Obligations to MCF, the Assignor does hereby grant to MCF a security interest in all of Assignor's Accounts.

Section 1.02  Collection of Accounts.  MCF hereby agrees to process, collect, and otherwise service all Accounts delivered to MCF which (i) qualify as "Qualified Accounts" pursuant to the Assignment Agreement; (ii) are assigned and delivered by Assignor to MCF; and/or (iii) arise out of the Assignor's normal business operations.  MCF may, but shall not be required to collect any other of Assignor's Accounts.

Section 1.03  Delivery of Accounts and Collection.   The Assignor agrees to deliver to MCF at least once a week, certain of its Accounts for collection and processing under this Agreement.

Section 1.04  Uncollectible Accounts.  If, after ninety (90) days from the date of the original invoice, any Accounts remain uncollected, the Assignor agrees that MCF shall be released from any obligation to make further collection efforts or in any way service or process such Accounts; provided, however, that all Accounts returned to Assignor shall remain subject to MCF's security interest and Assignor shall remit any proceeds of such Accounts to MCF for application in accordance with the Assignment Agreement.  As a part of its collection efforts, MCF is not required to, but may choose to, institute legal proceedings on behalf of the Assignor to secure payment of the assigned Accounts.

## ARTICLE II
### Fees:  Application of Receipts

Section 2.01  Service Fees.  The Assignor shall pay for services rendered by MCF hereunder in accordance with the Fee Schedule attached hereto as Exhibit A (the "Fee Schedule").  It is expressly understood

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Assignment Agreement.

000032

that such charges may be increased or decreased by MCF or its President without notice and at any time and that such changes shall be and become a part of this Agreement as though set forth verbatim herein.  In addition to these fees, Assignor shall promptly repay to MCF any actual costs incurred in the collection of Accounts which were not specifically provided for in the Fee Schedule.

Section 2.02  <u>Assignment Agreement</u>.  Assignor acknowledges that amounts collected by MCF related to the Accounts or otherwise shall be applied to pay down the Assignor's Obligations pursuant to the terms of the Assignment Agreement.

ARTICLE III
<u>Termination</u>

Section 3.01  <u>Termination of Assignment Agreement</u>.  This Agreement shall be effective only so long as the Assignment Agreement remains in effect.  If for any reason the Assignment Agreement terminates, this Agreement shall also terminate on the same date as the termination of the Assignment Agreement; provided, however, MCF's security interest in the Accounts and MCF's right to continue to collect the Accounts and apply the proceeds as set forth in the Assignment Agreement shall survive the termination of this Agreement.

Section 3.02  <u>Default Under Assignment Agreement</u>.  Upon a default by the Assignor hereunder or under the Assignment Agreement, MCF may immediately cancel this Agreement without prior notice.

Section 3.03  <u>Continuing Obligations</u>.  The termination of this Agreement shall not affect the Assignor's Obligations hereunder for the payment of the Assignor's Obligations to MCF.  All Accounts of the Assignor shall remain as security for the Assignor's Obligations notwithstanding termination of this Agreement.  In the event MCF accepts the assignment of any Accounts of the Assignor for collection and processing after termination of the Assignment Agreement, all of the assignments shall be subject to all of the terms and conditions of this Agreement, and MCF shall have all of the rights and remedies provided herein with respect to any and all of the assigned Accounts.

Section 3.04  <u>Offset</u>.  Upon the termination of this Agreement, MCF may retain any monies then due from MCF to the Assignor as security for full payment of all the Assignor's Obligations to MCF, and all obligations, debts, claims or liabilities of any nature then owing, or thereafter found to be owing by the Assignor to MCF.  The amount of all obligations, debts, claims, or liabilities shall then be deducted from any monies due to the Assignor by MCF. Upon payment in full of all of Assignor's Obligations to MCF, MCF may retain the Proceeds of any Account for a period not to exceed one hundred twenty (120) days.

ARTICLE IV
<u>Miscellaneous</u>

Section 4.01  <u>No Right to Inspect</u>.  The Assignor shall have no right to inspect or examine the Accounts, or other receivables of any other MCF customer, or any information respecting the same in the possession of MCF.

Section 4.02  <u>Confidentiality Accounts</u>.  MCF agrees that no other MCF customers have any right to inspect or examine the Accounts of the Assignor or any information respecting the same in the possession of the Company.

Section 4.03  <u>Costs and Expense of Enforcement</u>.  The Assignor agrees to pay all costs and expenses, including attorneys' fees, incurred by MCF in collecting or attempting to collect any sums owed by the Assignor

2

to MCF or otherwise enforcing any obligations of the Assignor to MCF.

Section 4.04  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

Section 4.05  <u>Jurisdiction</u>.  Assignor agrees that the state and federal courts sitting in the State of Minnesota shall have exclusive jurisdiction to hear and determine any claims or disputes between MCF and Assignor pertaining directly or indirectly to this Agreement and Assignor waives any objection to inconvenient forum.

Section 4.06  <u>Waiver of Trial by Jury</u>.  MCF and Assignor each waives any right to a TRIAL BY JURY in any action to enforce, hear and determine any claims or disputes between MCF and Assignor pertaining directly or indirectly to this Agreement and Assignor agrees that any action or proceeding shall be tried before a Court and not before a jury.

Section 4.07  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assign.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

| Marquette Commercial Finance,<br>A division of Marquette<br>Transportation Finance, LLC.<br><br><br><br>By_____<br>Its Authorized Signatory | Document Processing Solutions, Inc.<br><br><br><br>By: _____<br><br>Title: _____ |

3

## SCHEDULE A
## FLAT RATE FEE SCHEDULE

1.  **Amount of Fixed Discount.** The amount of the Fixed Discount shall be as follows:

    | Days  | Discount |
    |-------|----------|
    | 1-30  | 0.20%    |
    | 31-45 | 0.30%    |
    | 46-60 | 0.40%    |
    | 61-75 | 0.50%    |
    | >76   | 0.60%    |

2.  **Variable Discount**. The Base Rate plus two percent (2.00%) per annum; provided, however, in no event shall the Variable Discount with respect to any Account assigned hereunder be less than five percent (5.00%) per annum.

3.  **Direct Collect Fee**. Assignor shall be charged a direct collect fee of fifteen percent (15%) of the Gross Amount of any Account whenever the proceeds of an Account is paid to Assignor and the Account Proceeds are not remitted to MCF within three (3) business day from the receipt of the Account Proceeds.

4.  **Service Charge Fee**.  Assignor hereby agrees to pay MCF a servicing fee on the first day of each calendar month equal to (i) $10,000.00 minus (ii) the total Fixed Discount and Variable Discount, earned during the previous month (the "Servicing Fee"). Assignor hereby authorizes MCF, in MCF's sole discretion, to collect any amounts that are attributable to the Servicing Fee by (i) by reducing the Initial Payment or any Advance for any Account, (ii) debiting the Assignor's operating account, or (iv) using any combination of the foregoing.  The fee shall be paid to MCF so long as this Agreement is in effect.  Assignor and MCF acknowledge and agree that the Servicing Fee is intended as reasonable compensation to MCF for making this facility available under the terms of this Agreement and for no other purpose.

5.  **Processing Fees**

    | | |
    |---|---|
    | Settlement by Wire Transfer | $35.00 per wire |

000035

**EXHIBIT 5**

| Vendor | Bill from | Balance Total |
| --- | --- | --- |
| Adams WA County Recorder | 210 W. Broadway, Ritzville, WA 99169 | 119.50 |
| Alameda CA County Recorder | 1106 Madison St., Oakland, CA 94607 | 1,739,306.75 |
| Amador CA County Recorder | 810 Court St, Jackson, CA 95642 | 2,901.00 |
| Bristol RI County Recorder | 283 County Rd, Barrington, Rhode Island 02806-2406 | 80.00 |
| Caddo LA County Recorder | 501 Texas Street #103, Shreveport, LA 71101 | 205.00 |
| CCCA-Colorado County Clerks Association | Colorado County Clerks Association c/o Matt Crane P.O. Box 3095 Littleton, CO 80161 | 895.00 |
| Charlevoix MI County Recorder | 301 State St, Charlevoix, MI 49720 | 60.00 |
| City of Brea - 0507 Van IND | City of Brea 1 Civic Center Circle PO Box 2237 Brea, CA 92827-2237 | 76.51 |
| City of Brea - 2009 IND | City of Brea 1 Civic Center Circle PO Box 2237 Brea, CA 92827-2237 | 295.01 |
| City of Brea - 2507 FM LAM | City of Brea 1 Civic Center Circle PO Box 2237 Brea, CA 92827-2237 | 12.61 |
| Colusa CA County Recorder | 547 Market St #101, Colusa, CA 95932 | 724.50 |
| El Dorado CA County Recorder | 360 Fair Ln, Placerville, CA 95667 | 20,218.90 |
| El Paso TX County Recorder | 500 E. San Antonio, El Paso, TX 79901 | 162.00 |
| Essex MA County Recorder | 1 Union Street, Suite #402 Lawrence, MA 01840 | 410.00 |
| Fairfield CT County Recorder | 611 Old Post Road, Fairfield, CT 06824 | 289.00 |
| Fayette OH County Recorder | 133 S. Main Street #305, Washington Court House, OH 43160 | 146.00 |
| Fresno CA County Recorder | 2281 Tulare St, Fresno, CA 93721 | 82.00 |
| Glynn GA County Recorder | 701 H St, Brunswick, GA 31520 | 1,156.00 |
| Grays Harbor WA County Recorder | 100 W Broadway, Montesano, WA 98563 | 363.50 |
| Hartford CT County Recorder | 550 Main Street, 1st Floor, Suite 104 Hartford, CT 06103 | 473.00 |
| Imperial CA County Recorder | 940 Main St, El Centro, CA 92243 | 23,073.05 |
| Inyo CA County Recorder | 168 N Edwards St, Independence, CA 93526 | 637.50 |
| Kern CA County Recorder | 1530 Truxtun Ave, Bakersfield, CA 93301 | 49,367.20 |
| Kings CA County Recorder | 1400 W Lacey Blvd, Hanford, CA 93230 | 12,326.10 |
| Lake CA County Recorder | 255 N Forbes St # 223, Lakeport, CA 95453 | 2,228.55 |
| Lassen CA County Recorder | 220 S Lassen St #5th, Susanville, CA 96130 | 1,377.00 |
| Lincoln WA County Recorder | 450 Logan St / PO Box 28, Davenport, Washington 99122 | 234.00 |
| Louisa VA County Recorder | 100 West Main St / Box 37, Louisa, Virginia 23093-0037 | 776.16 |
| Marin CA County Recorder | 3501 Civic Center Dr # 232, San Rafael, CA 94903 | 52.00 |
| Mariposa CA County Recorder | 4982 10th St, Mariposa, CA 95338 | 370.00 |
| Mendocino CA County Recorder | 501 Low Gap Rd # 1020, Ukiah, CA 95482 | 3,308.60 |
| Minnehaha SD County Recorder | 415 N Dakota Ave, Sioux Falls, SD 57104 | 60.00 |
| Monroe TN County Recorder | 103 College Street South, Suite #4, Madisonville, TN 37354 | 209.24 |
| Nevada CA County Recorder | 950 Maidu Ave, Nevada City, CA 95959 | 17,801.60 |
| New London CT County Recorder | 181 State Street New London, CT 06320 | 214.00 |
| Orleans LA County Recorder | 1340 Poydras Street fourth floor, New Orleans, Louisiana 70112 | 560.00 |
| Plumas CA County Recorder | 520 Main St #102, Quincy, CA 95971 | 1,477.55 |
| Proshred North Texas | Proshred North Texas 2081 Hutton Dr. Ste. 103 Carrollton, TX 75006 | 39.00 |
| Providence RI County Recorder | 25 Dorrance Street, Providence, RI 02903 | 161.30 |
| Riverside CA County Recorder | 4080 Lemon St, Riverside, CA 92501 | 21.00 |

000037

| | | |
|---|---|---|
| Sacramento CA County Recorder | 600 8th Street Sacramento, CA 95814 | 190,609.72 |
| San Benito CA County Recorder | 440 5th St #108, Hollister, CA 95023 | 30,873.10 |
| San Bernardino CA County Recorder | 222 W Hospitality Ln, San Bernardino, CA 92415 | 44.00 |
| San Diego CA County Recorder | 1600 Pacific Highway, Suite 260 San Diego, CA 92101 | 503.05 |
| San Francisco CA County Recorder | 1 Dr Carlton B Goodlett Pl #190, San Francisco, CA 94102 | 222.00 |
| San Joaquin CA County Recorder | 44 N San Joaquin St #260, Stockton, CA 95202 | 84,411.05 |
| Sandusky OH County Recorder | 100 N Park Ave #217, Fremont, OH 43420 | 142.00 |
| Sanilac MI County Recorder | 60 Sanilac Rd # 202, Sandusky, MI 48471 | 30.00 |
| Santa Clara CA County Recorder | 70 W Hedding St 1st Floor, San Jose, CA 95110 | 1,127,098.80 |
| Santa Cruz CA County Recorder | 701 Ocean St # 230, Santa Cruz, CA 95060 | 5.00 |
| Sierra CA County Recorder | 100 Courthouse Square, Downieville, CA 95936 | 170.00 |
| Siskiyou CA County Recorder | 311 4th St #108, Yreka, CA 96097 | 9,010.00 |
| Siskiyou County IT | Siskiyou County IT ATTN: Judy Crawford 311 Fourth St., Rm 102 Yreka, CA 96097 | 200.00 |
| Skamania WA County Recorder | 240 Vancouver Ave, Stevenson, WA 98648 | 293.00 |
| Snohomish WA County Recorder | 3000 Rockefeller Ave, Everett, WA 98201 | 20.00 |
| Solano CA County Recorder | 675 Texas Street #2700, Fairfield, CA 94533 | 286.00 |
| Spink SD County Recorder | 210 E 7th Avenue, Suite 8 Redfield SD 57469-1299 | 30.00 |
| Stanislaus CA County Recorder | 1021 I St Suite 101, Modesto, CA 95354 | 89,209.65 |
| Sutter CA County Recorder | 433 Second St, Yuba City, CA 95991 | 11,490.95 |
| Tehama CA County Recorder | 633 Washington St # 12, Red Bluff, CA 96080 | 965.75 |
| Trinity CA County Recorder | 11 Court St, Weaverville, CA 96093 | 6,641.70 |
| Van Zandt TX County Recorder | 121 E. Dallas St., Room 202 Canton TX, 75103 | 34.00 |
| Yolo CA County Recorder | 625 Court St #104, Woodland, CA 95695 | 15,443.05 |
| Yuba CA County Recorder | 915 8th St # 107, Marysville, CA 95901 | 719.20 |
| **Total** | | **3,450,722.15** |

000038

**EXHIBIT 6**

|  | 22-May | 29-May | 5-Jun | 12-Jun |
|---|---|---|---|---|
| **Expense** | | | | |
| Bank Service Charges | 4,176.92 | 4,176.92 | 4,176.92 | 4,176.92 |
| Computer and Internet Expenses | 18,878.40 | 18,878.40 | 18,878.40 | 18,878.40 |
| Contributions | 1.25 | 1.25 | 1.25 | 1.25 |
| Court Expense | 217.50 | 217.50 | 217.50 | 217.50 |
| License and Permits | 997.63 | 997.63 | 997.63 | 997.63 |
| Marketing Expense | 1,290.45 | 1,290.45 | 1,290.45 | 1,290.45 |
| Office Expense | 11,528.82 | 11,528.82 | 11,528.82 | 11,528.82 |
| Outside Services | 4,563.44 | 4,563.44 | 4,563.44 | 4,563.44 |
| Postage and Delivery | 21,131.96 | 21,131.96 | 21,131.96 | 21,131.96 |
| Professional Fees | - | - | - | - |
| Accounting & Legal | 19,451.44 | 19,451.44 | 19,451.44 | 19,451.44 |
| IT Subcontract | 12,132.20 | 12,132.20 | 12,132.20 | 12,132.20 |
| Professional Fees - Other | 1,085.56 | 1,085.56 | 1,085.56 | 1,085.56 |
| Recording Expenses (1) | 22,000,000.00 | 22,000,000.00 | 22,000,000.00 | 22,000,000.00 |
| Confo Service Fee | 21.25 | 21.25 | 21.25 | 21.25 |
| ERecording Simplifile | 701.83 | 701.83 | 701.83 | 701.83 |
| Recording Expenses - Other | 7,668.69 | 7,668.69 | 7,668.69 | 7,668.69 |
| Rent Expense | | | 88,298.84 | |
| Repair & Maintenance | 3,912.45 | 3,912.45 | 3,912.45 | 3,912.45 |
| Selling Expense | 860.07 | 860.07 | 860.07 | 860.07 |
| Telephone Expense | 10,929.52 | 10,929.52 | 10,929.52 | 10,929.52 |
| Transportation | 609.44 | 609.44 | 609.44 | 609.44 |
| Travel Expense | - | - | - | - |
| Travel Expense - Sales & Market | 4,194.18 | 4,194.18 | 4,194.18 | 4,194.18 |
| Travel Expense - Other | 2,207.65 | 2,207.65 | 2,207.65 | 2,207.65 |
| Utilities | 3,818.42 | 3,818.42 | 3,818.42 | 3,818.42 |
| **Total Expense(2)** | **22,130,379.06** | **22,130,379.06** | **22,218,677.90** | **22,130,379.06** |

**(1) Recording expenses are a "wash". They are reimbursed from escrow after they are paid by the Debtor.**

**(2) This expense total does not include the $3,450,722.15 that the Debtor is seeking to pay** .
**critical vendors. However, the Debtor is seeking to expend this additional sum to the extent necessary.**
**The totals above would be increased by this sum.**

**EXHIBIT 7**

# Statistical Summary

Company:A3I - SYNRGO INC
Week#:18
Qtr/Year:2/2021

Service Center:0070 Southern Californi
Pay Date:05/07/2021
Run Time/Date:19:58:16 PM EDT 05/05/202?

Status:Under Review
P/E Date:04/30/2021

## Taxes Debited

| | |
|---|---|
| Federal Income Tax | 60,594.74 |
| Earned Income Credit Advance | 0.00 |
| Social Security - EE | 40,649.24 |
| Social Security - ER | 40,649.12 |
| Social Security Adj - EE | 0.00 |
| Medicare - EE | 9,657.79 |
| Medicare - ER | 9,657.81 |
| Medicare Adj - EE | 0.00 |
| Medicare Surtax - EE | 0.00 |
| Medicare Surtax Adj - EE | 0.00 |
| COBRA Premium Assistance Payments | 0.00 |
| Federal Unemployment Ta | 522.46 |
| FMLA-PSL Payments Credi | 0.00 |
| FMLA-PSL ER FICA Credit | 0.00 |
| FMLA-PSL Health Care Premium Cred | 0.00 |
| Employee Retention Qualified Payments Crec | 0.00 |
| Employee Retention Qualified Health Care Crec | 0.00 |
| State Income Tax | 15,659.27 |
| Non Resident State Income Ta | 0.00 |
| State Unemployment Insurance - EE | 42.03 |
| State Unemployment Insurance - ER | 0.00 |
| State Unemployment Insurance Adj - EE | 5,298.31 |
| State Disability Insurance - EE | 0.00 |
| State Disability Insurance Adj - EE | 0.00 |
| State Unemployment/Disability Ins - EE | 2,579.35 |
| State Family Leave Insurance - EE | 20.89 |
| State Family Leave Insurance - ER | 60.97 |
| State Family Leave Insurance Adj - EE | 0.00 |
| State Medical Leave Insurance - EE | 18.80 |
| State Medical Leave Insurance - ER | 22.99 |
| Transit Tax - EE | 6.19 |
| Workers' Benefit Fund Assessment - EE | 0.35 |
| Workers' Benefit Fund Assessment - ER | 0.35 |
| Local Income Tax | 874.15 |
| School District Tax | 0.00 |
| **Total Taxes Debited** | **186,316.01** |

## Other Transfers

| | |
|---|---|
| ADP Check Acct. No | 38,285.13 |
| Full Service Direct Deposit Acct. | 504,591.52 |
| **Total Amount Debited From Your Account** | **733,210.04** |

**Total Liability  733,210.04**

## Bank Debits & Other Liability

| | |
|---|---|
| Adjustments/Prepay/Void | 4,037.38 |

4,958.14

738,168.18

## Taxes- Your Responsibility

None this payroll

738,168.18