**BRYAN CAVE LEIGHTON PAISNER LLP**
H. Mark Mersel, California Bar No. 130382
Olivia J. Scott, California Bar No. 329725
1920 Main Street, Suite 1000
Irvine, California 92614-7276
Telephone:    (949) 223-7000
Facsimile:    (949) 223-7100
E-Mail:    mark.mersel@bclplaw.com
    olivia.scott3@bclplaw.com

Attorneys for Creditor
UMB BANK, N.A., as successor by merger to
MARQUETTE TRANSPORTATION FINANCE, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA (SANTA ANA)

| | |
|---|---|
| In re:<br><br>SYNRGO, INC.,<br><br>　　　　　Debtor. | Chapter 11<br><br>Case No. 8:21-bk-11264-ES<br><br>**EMERGENCY MOTION FOR APPOINTMENT OF TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: []<br>Time: []<br>Place: Courtroom 5A<br>　　　　411 West Fourth Street<br>　　　　Santa Ana, CA 92701 |

Creditor UMB Bank, N.A. ("**UMB**") respectfully moves (the "**Motion**") this Court for entry of an order directing the appointment of a chapter 11 trustee in the above-captioned chapter 11 case filed by Synrgo, Inc. ("**Debtor**"). In support of the Motion, UMB submits the included Memorandum of Points and Authorities, the Declaration of Matthew A. Howe that was previously filed in support of Notice of Perfection of Security Interest and Non-Consent to Use of Cash Collateral ("**Howe Decl.**") [Doc. No. 21] and the Declaration of Douglas Wilson in support of Emergency Motion for Appointment of Trustee ("**Wilson Decl.**").

## JURISDICTION & VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. UMB confirms its

consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, to the entry of a final Order by this Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The bases for the relief requested herein are Sections 105(a) and 1104 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Code**").[1]

<strong><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></strong>

## I.    INTRODUCTION

UMB has, for several years, loaned funds to Debtor. This lending relationship involved: (i) Debtor's grant to UMB of a blanket lien encumbering substantially all of Debtor's personal property assets, including but not limited to accounts receivable and proceeds thereof; and (ii) the absolute assignment of certain accounts receivable to UMB. Debtor has acknowledged numerous defaults under its contracts with UMB, and as a result UMB has terminated its obligation to make any further advances and has declared all outstanding amounts owed immediately due and owing. The total outstanding balance owed as of May 14, 2021, is over $36 Million. (Howe Decl. ¶72).

Not only has Debtor failed to pay UMB as required pursuant to this lending relationship (and refused to do so when pressed), but Debtor has recently admitted, and has disclosed documents supporting this admission, to UMB that Debtor falsified its records and has actively diverted tens of millions of dollars away from UMB. As of May 12, 2021, Debtor reported to UMB that its accounts receivable balance exceeded $50 Million, but within 24 hours, Debtor's president and accounting staff revealed that Debtor had actually been collecting accounts directly from customers, diverting collections to still undisclosed accounts without remitting any payments to UMB, and continuing to report those accounts as outstanding accounts receivable to inflate Debtor's borrowing availability. (Howe Decl. ¶¶ 49-50). As a result, UMB learned the true gross value of UMB's property and collateral had evaporated from approximately $50 million to less than $8 million. (Howe Decl. ¶ 60).

---

[1] All references to sections shall refer to the Code unless otherwise specified herein.

Further, Debtor's president admitted that Debtor has falsified its books and records, maintaining two sets of financial records to conceal massive losses over a period of several years while reporting otherwise to UMB in order to continue receiving funds. (Howe Decl. ¶ 67). Debtor is insolvent – and has been for years – and only remained in operation for so long as a result of its deceitful conduct toward UMB. (Howe Decl. ¶ 74).

Debtor's unlawful and dishonest conduct justifies the immediate appointment of a chapter 11 trustee to recover and safeguard Debtor's assets and prevent serious and irreparable harm to the Debtor's creditors

## II.    STATEMENT OF FACTS

### A.    Debtor's Business Operations and Relationship to UMB.

Debtor's business revolves entirely around real estate closings. Specifically, Debtor performs document recording services for escrow agents (such as title companies), including paying the related fees and transfer taxes; and in return, the escrow agents reimburse Debtor for the fees and taxes paid plus a service fee. Debtor invoices the escrow agents, who typically pay shortly after the transaction has closed. Debtor has built relationships with counties in California and many other states, as well as title companies who conduct business across the country. (Howe Decl. ¶ 4).

On or about January 11, 2017, Debtor and Marquette Commercial Finance, a division of Marquette Transportation Finance, LLC ("**MCF**") entered into that certain MCF Account Assignment and Security Agreement (the "**Original Assignment Agreement**"). (Howe Decl. ¶ 6, Ex. 1). MCF and Debtor then entered into that certain Amended and Restated MCF Account Assignment and Security Agreement dated September 25, 2017 (the "**Amended and Restated Assignment Agreement**"), which was modified and amended from time to time. (Howe Decl. ¶ 6, Ex. 2). UMB acquired all of MCF's rights and obligations under the Assignment Agreement by way of merger. (Howe Decl. ¶ 5).

The Assignment Agreement is a hybrid between a standard full recourse factoring agreement and an asset-based secured revolving loan. (Howe Decl. ¶12). "Factoring" is a type of financing where the borrower assigns its accounts receivable to the lender, and the lender provides the borrower with cash equal to some percentage of the gross amount of the accounts receivable. Collections from

account debtors repay the lender. (Howe Decl. ¶ 13).

An asset-based secured revolving loan uses a company's assets as collateral to secure borrowing that can be repaid and readvanced. The amount available to the borrower as an advance is calculated under a formula using a percentage of the value of certain portions of the collateral. As the collateral changes (for example, as inventory is added or sold, or as accounts are generated or collected), the amount available to borrow changes. (Howe Decl. ¶ 12).

As between UMB and Debtor, the factoring components include the absolute assignment (not assignment of a security interest, but rather transferring title ownership of the accounts) of certain accounts to UMB, with full recourse to Debtor. (*See,* Assignment Agreement, §§ 2.01, 2.02). The asset-based lending components include a formulaic approach to calculate the maximum borrowing availability based on Debtor's accounts receivable, and a blanket lien against all of Debtor's assets (including all accounts and proceeds thereof) to secure the entire outstanding balance owed to UMB. (Howe Decl. ¶ 12; Assignment Agreement, §§ 3.01, 3.02).

Pursuant to Sections 4.01 and 4.02 of the Assignment Agreement, any advance drawn by Debtor was repaid upon collection of the accounts. UMB had the option of collecting payment directly on Debtor's invoices to customers; in the event an account debtor remitted payment to Debtor, Debtor was obligated to hold the payment in trust for UMB, not commingle the funds, and deliver the payment by the close of the next business day. (Assignment Agreement, §§ 4.01, 4.02). Thus, accurate accounts receivable reporting to UMB, including new invoicing and collections status, and timely remittance to UMB of all payments received by Debtor from account debtors, was critical to maintaining the health of the lending relationship between the parties. (Howe Decl. ¶ 15).

Debtor was further contractually obligated to provide accurate information and documents. (Assignment Agreement, § 3.05) Debtor agreed to provide income and cash flow statements for each fiscal year and represented and warranted that "each statement of income and statement of cash flows will fairly present, in all material respects, the result of operations and cash flows of [Debtor.]" (Assignment Agreement, § 5.01). (Howe Decl. ¶ 16).

**B.    Debtor Diverted UMB Funds in Violation of the Assignment Agreement.**

In February 2019, UMB learned that Debtor was collecting accounts receivable directly from

account debtors. This direct collection violated the Assignment Agreement and allowed Debtor to circumvent payment to UMB of collected accounts. Accordingly, UMB issued a default letter. (Howe Decl. ¶ 18, Ex. 4).

Following the issuance of the default letter, UMB and Debtor amended the Amended and Restated Assignment Agreement effective as of April 9, 2019. Debtor acknowledged its violation of the Assignment Agreement, stemming from its direct collection from account debtors and commingling of those funds, and agreed to an express prohibition from maintaining any bank account at any institution other than Bank of Hemet – the institution used by Debtor for standard banking services. (Howe Decl. ¶ 19).

Further, following the issuance of the default letter, UMB worked closely with Sonny Lim, Debtor's controller at the time, to reconcile the accounts Debtor directly collected and failed to remit to UMB. UMB discovered Debtor diverted more than $10 Million in payments that Debtor should have remitted or paid to UMB. UMB worked closely with Debtor to close the direct collection deficit and bring Debtor into compliance with its obligations under the Assignment Agreement, and by April 2020, UMB understood the parties had effectively eliminated the direct collection deficit. (Howe Decl. ¶¶ 20-22). While UMB collected on invoices from customers in its Wells Fargo lockbox account (and preferred to do so), at Debtor's request UMB also negotiated and ultimately entered into a deposit account control agreement with Bank of Hemet and caused Debtor's accounts with Bank of Hemet to become "controlled accounts," which restricted Debtor's ability to withdraw funds therefrom and allowed UMB to sweep collections on a daily basis. (Howe Decl. ¶¶ 23-24).

During the course of resolving the payment control issues, Debtor, through Mr. Lim, admitted to UMB that approximately 15 or 16 customers continued to remit payment by check directly to Debtor and that Debtor was not sending those checks to UMB. In a further amendment to the Amended and Restated Assignment Agreement effective September 15, 2020, Debtor acknowledged that it continued to violate its contractual obligations by direct collecting accounts and commingling those funds, and Debtor agreed that it must: (i) remit all collections into the UMB lockbox account or the Bank of Hemet controlled accounts; and (ii) resolve any other account debtor remittance issues "as soon as practicable." (Howe Decl. ¶¶ 25-26). Debtor's failure to ensure the remittance of 100%

of all collections into the UMB lockbox account or the Bank of Hemet controlled accounts by November 30, 2020, constituted an event of default. (Howe Decl. ¶ 27).

### C.  Debtor Unsuccessfully Pursued Alternative Financing.

Meanwhile, during this timeframe (from 2019 and into 2020), Debtor's books reflected a growing receivables base, indicating its business was growing. Debtor pursued bond financing to provide Debtor with much-needed liquidity, but the transaction did not close due to the COVID-19 pandemic. (Howe Decl. ¶ 29).

In or around April 2020, Debtor hired Ben Sherman as its president and on April 30, 2020, without seeking UMB's consent as required under the Assignment Agreement, an affiliated entity owned by Karl Klessig acquired all of the ownership interests in Debtor.[2] Mr. Klessig became chairman of Debtor's board of directors and chief executive officer. (Howe Decl. ¶ 29).

Debtor requested increases to its maximum borrowing limit in order to have the liquidity necessary to keep up with its growth. Because accounts receivable volume continued to increase and UMB was making significant progress shoring up its account collections mechanics, UMB incrementally increased the maximum borrowing limit. However, UMB continued to monitor and inquire about other sources of liquidity. Debtor continued to pursue bond financing that, to UMB's knowledge, was the only source of financing Debtor was pursuing. (Howe Decl. ¶ 30). Over the next several months (which was during the height of the COVID-19 pandemic), UMB entered into amendments of the Amended and Restated Assignment Agreement based on Debtor's repeated affirmations and representations that financing was forthcoming, and that once Debtor received funds from the financing it would pay down or pay off its outstanding balance owed to UMB. (Howe Decl. ¶ 31). These amendments included obligations to pay down principal (the "**Principal Paydown**") and pay off the outstanding indebtedness the **Payoff**") by certain fixed dates. (Howe Decl. ¶ 32).

### D.  UMB Learned Debtor Continued to Divert UMB Funds to Its Own Accounts.

In March 2021, UMB learned that Debtor had replaced Mr. Lim with a new controller, James Nastase. (Howe Decl. ¶ 34). Mr. Nastase disclosed that a number of customers had continued sending

---

[2] Any change in the ownership of Debtor, whether by asset sale, sale or transfer of interests, or merger, without the prior written consent of UMB, constituted an event of default under the Assignment Agreement. (See, Assignment Agreement, § 6.01(vi), (vii), (x).

payments directly to Debtor, that Debtor had accounts at a financial institution other than Bank of Hemet, and that Debtor had been depositing into that account checks received directly from an account debtor with large accounts receivable – thus violating multiple provisions of the Assignment Agreement. (Howe Decl. ¶ 34).

UMB attempted, but was unable to complete, an examination of Debtor's financial books and records. (Howe Decl. ¶ 35).

Debtor failed to make the Principal Paydown when due on April 15, 2021, and failed to make the Payoff when due on April 30, 2021. (Howe Decl. ¶ 36). Despite its numerous defaults, Debtor continued to request that UMB advance additional sums to provide it necessary liquidity to operate its business. Debtor further threatened on several occasions that if UMB did not continue advancing funds, Debtor would be unable to fulfill its customer commitments (funding recording fees and other related expenses), customers would find alternative service providers, Debtor would be unable to restore its relationships, and Debtor's business would crumble – thereby impairing UMB's ability to recover the outstanding balance due and owing. (Howe Decl. ¶¶ 37, Ex. 5).

On April 30, 2021, UMB and Debtor entered into a Forbearance & Modification Agreement ("**Forbearance Agreement**"). (Howe Decl. ¶ 40, Ex. 6). In the Forbearance Agreement, Debtor acknowledged a number of defaults, and UMB preserved the defaults while making other financial accommodations. (Howe Decl. ¶ 41; Forbearance Agreement, Recitals and §§ 4, 7, and 8). UMB agreed to the Forbearance Agreement in reliance on Debtor's representation and presentation of its accounts receivables, which reflected outstanding accounts receivables of approximately $55 Million, all of which were aged less than 90 days. (Howe Decl. ¶ 42).

E.   **UMB Learned Debtor's Accounts Receivable Are Massively Overstated.**

Within days after entering into the Forbearance Agreement, in the course of reviewing Debtor's accounts receivables reports, UMB observed significant amounts of aging accounts receivables that diminished Debtor's borrowing availability. This was unusual, especially given the nature of the business – under which accounts are generally paid within days or weeks of invoicing, not months. (Howe Decl. ¶¶ 43-44). Nonetheless, Debtor requested advances that exceeded its maximum availability and overadvances. UMB communicated with Debtor on a daily basis in an

1  effort to understand the aging accounts receivable and to attempt to address the funding requests.
2  (Howe Decl. ¶ 45). With Debtor's consent, UMB began issuing letters directing account debtors to
3  pay UMB. (Howe Decl. ¶ 46). Debtor reported its continued investigation into the aging accounts
4  receivables and continued to request advances that seemed to increase in amount each day. (Howe
5  Decl. ¶¶ 47-48).

6        On May 12, 2021, UMB refused to purchase accounts, as the Assignment Agreement
7  permitted it to do, thus further limiting Debtor's borrowing availability. Debtor contacted UMB and
8  expressed its concern about its liquidity. Debtor again threatened that without funding its customers
9  would immediately discontinue their business with Debtor and Debtor would not be able to operate.
10 UMB stood by its decision. (Howe Decl. ¶ 49).

11       On May 13, 2021, Mr. Sherman, president of Debtor, contacted UMB, and stated that, based
12 on Debtor's internal examination, the accounts receivables report that had been provided to UMB
13 reflecting more than $46 Million in outstanding accounts receivable was overstated by a staggering
14 $21 to $26 Million. Mr. Sherman could not explain why or how this had happened and he denied
15 having any knowledge regarding the location of the collected funds. (Howe Decl. ¶ 50). Later that
16 same day, after UMB made additional requests for information, Debtor delivered an excel
17 spreadsheet titled "Debtor invoices greater than 37 days summary by customer as of 2021-05-
18 13.xlsx" (the "**Spreadsheet**"), reflecting that of the nearly $45 Million of accounts receivable that
19 Debtor had reported to UMB as outstanding and on which UMB relied, all but approximately
20 $200,000 had been collected directly from customers and not reported or remitted to UMB. (Howe
21 Decl. ¶¶ 53-54, Ex. 7).

22       Following the receipt of the Spreadsheet, UMB contacted Mr. Klessing, Ms. Caballero, Mr.
23 Nastase, and Mr. Sherman – each of them admitted the accuracy of the information on the
24 Spreadsheet to varying degrees, and uniformly denied having any knowledge of the whereabouts of
25 the funds. (Howe Decl. ¶¶ 55-58, Exs. 8 and 9).

26       Throughout the day on May 13, 2021, account debtors continued to remit payments into the
27 lockbox account and into the Bank of Hemet controlled account, meaning Debtor still continued to
28 advance funds and issue invoices. (Howe Decl. ¶ 61). On May 13, 2021, UMB's counsel sent a

Notice of Default, Termination, and Demand for Payment ("**Termination Letter**"), by which UMB terminated the Assignment Agreement and demanded immediate payment in full of the entire outstanding balance owed by Debtor. (Howe Decl. ¶ 59, Ex. 10).

        F.        **UMB Learned Debtor Has Been Falsifying Its Books To Cover Up Its Insolvency.**

On May 14, 2021, Mr. Sherman reported to UMB that the funds reflected on the Spreadsheet as collected but not remitted to UMB had been spent on operations and items such as owner salaries and the purchase of a Mercedes. This would mean that the company had been spending far more than its revenue by a magnitude of millions of dollars. (Howe Decl. ¶¶ 62-65).

This was startling to UMB, as Debtor's financial reporting for years had reflected positive cash generation and profitability. (Howe Decl. ¶ 67, Exs. 11 and 12). Mr. Sherman then *admitted that the financial statements were false* and that *Debtor maintains two separate sets of books and records* (Howe Decl. ¶ 67). Mr. Sherman further admitted that, to his knowledge, Debtor has been losing money since 2017. (Howe Decl. ¶ 68).

Mr. Sherman further informed UMB that the business was very likely to close on Monday, May 17; 2021 some counties and title companies had already contacted Debtor for failing to fund closing fees as required and one specific customer of Debtor, Fidelity Title, asserted an intensifying workload bottleneck and transaction halt as a result of Debtor's failure to fund. (Howe Decl. ¶¶ 69-70). Notwithstanding Mr. Sherman's threat to close the business, throughout the day on May 14, 2021 UMB's controlled accounts received payments of outstanding accounts receivable. (Howe Decl. ¶ 72).

As of the close of business May 14, 2021, Debtor owed UMB more than $36 Million. (Howe Decl. ¶ 72).

Thereafter, on May 18, 2021, Debtor filed for bankruptcy relief under chapter 11 of the Code.

**III.**        **THE NEED FOR EMERGENCY RELIEF**

As described above, Debtor has undertaken a systematic concealment, dissipation, and misappropriation of its assets solely for its benefit and the benefit of its insiders – and to the detriment of UMB and all other creditors. Debtor has diverted funds intended for its creditors, misrepresented its financial condition and the value of its assets, kept two sets of books and records to mislead its

creditors, and consistently operated at a loss for the four years preceding its bankruptcy (which it kept hidden from its creditors). Appointment of a Chapter 11 trustee on an emergency basis is appropriate and necessary to prevent Debtor from continuing to misappropriate and deplete funds during the time that a motion on regular notice would be pending.

## IV.    ARGUMENT

### A.    Standard for Appointment of a Chapter 11 Trustee.

Debtors' actions constitute cause sufficient to require the appointment of a trustee under section 1104(a) of the Bankruptcy Code. Section 1104(a) of the Bankruptcy Code provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, ***the court shall order the appointment of a trustee***—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §1104(a) (emphasis added). Cases interpreting section 1104(a) uniformly hold that subsection (1) mandates the appointment of a trustee if "cause" is found, and that subsection (2) provides courts with a less rigid, discretionary basis for the appointment of a Chapter 11 trustee.

As noted above, Debtor's intentional diversion of funds from its creditors, knowing misrepresentations as to its financial condition and the value of its assets, multiple sets of books and records to mislead its creditors, and consistent, concealed operational losses for the past four years provides more than sufficient cause for the appointment of a trustee pursuant to Section 1104(a)(1). In addition, the best interests of creditors and the estate would be served by the appointment of a trustee under Section 1104(a)(2) because Debtor cannot be trusted as a fiduciary of the estate and its creditors.

### B.    Ample Cause Exists to Appoint a Chapter 11 Trustee.

"The sole question presented in a Section 1104(a)(1) motion is whether the acts or omissions of current management, whether committed before or after filing the Chapter 11 petition, supply the

'cause', as defined, to trigger the appointment of a trustee." *See, e.g., In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (citations omitted). Cause looks at the totality of a debtor's circumstances and may be found for multiple reasons. More specifically, while "cause" under Section 1104(a)(1) of the Bankruptcy Code includes "fraud, dishonesty, incompetence, or gross mismanagement," this list is not exhaustive. *See* 11 U.S.C. § 1104(a)(1); *see also, In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998); *In re Sidco, Inc.*, 162 B.R. 299, 301, n.1 (Bankr. E.D. Cal. 1993).

A debtor-in-possession under Chapter 11 must fulfill the duties of a fiduciary, which includes the duty to protect and preserve the debtor's property for the benefit of the creditors and refrain from "acting in a manner which could damage the estate, or hinder a successful reorganization[.]" *In re Thurmond*, 41 B.R. 464, 465 (Bankr. D. Or. 1983); *see also, In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[t]he willingness of Congress to leave a debtor-in-possession [in control of the estate] is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee.").

When the court finds cause under Section 1104(a)(1), appointment of a trustee is mandatory. 11 U.S.C. § 1104(a)(1) ("the court *shall* order the appointment of a trustee") (emphasis added); *see also In re Rivermeadows Assocs. Ltd.*, 185 B.R. 615, 617 (Bankr. D. Wyo. 1995) ("The appointment is mandatory under § 1104(a)(1) if a court finds cause"); *see also In re Colorado - UTE Elec. Ass'n*, 120 B.R. 164, 174 (Bankr. D. Colo. 1990) ("if the Court finds that cause for the appointment of a trustee exists, the Court has no discretion, but must appoint a trustee.").

Debtor's intentional diversion of funds from its creditors, knowing misrepresentations as to its financial condition and the value of its assets, multiple sets of books and records to mislead its creditors, and consistent, concealed operational losses for the past four years are textbook examples of the type of fraud, dishonesty, and gross mismanagement that constitute cause to appoint a trustee.

Debtor has engaged in a years-long campaign to divert millions of dollars away from UMB and into its own pockets. In fact, despite repeated inquiries, the location of these misappropriated funds remains unknown – conceivably a pool of assets exists that may bring UMB (and the other creditors of Debtor) closer to being made whole. However, without a trustee in place it is unlikely

these funds can be recovered.

With respect to Debtor's prepetition business dealings, the facts to date indicate that Debtor's management at best lacked sufficient grasp of the details of Debtor's businesses to run it effectively, resulting in four years of losses. Alternatively, at worst, the prepetition conduct of Debtor's management suggests possible fraud against UMB, weighing very heavily in favor of a Chapter 11 trustee. Debtor has been cash flow negative for years, only able to continue operations through funds obtained from UMB by repeated material misrepresentations and false documents or by outright misappropriation.

Debtor also cannot be trusted to act honestly and forthrightly. It has maintained two sets of books and records, in which it materially misstated asset values and its profit and loss, in order to induce UMB to advance funds and keep Debtor's business afloat. It is conceivable that Debtor has acted similarly toward other creditors and parties in interest and will continue to do so throughout this case, making it difficult to know when and whether Debtor is accurately reporting to the Court and parties in interest. This concern is only exacerbated by Debtor's history of misappropriating assets from its creditors and being unable to account for or locate such assets.

Without the appointment of a Chapter 11 trustee, Debtor's misappropriation, dissipation, and concealment of assets may continue, depleting assets that should otherwise be available to Debtor's creditors and estate.

Debtor's prepetition conduct indicates Debtor's inability to discharge its fiduciary duties as a debtor in possession and a wanton disregard of the rights of its creditors. *See*, *e.g.* *In re Bowman*, 181 B.R. 836, 844-45 (Bankr. D. Md. 1995) (appointing trustee because "[t]he inability to fulfill fiduciary duties of a debtor-in-possession is itself cause to appoint a trustee."). Were the Debtor to remain in possession during this case, it would continue to misappropriate and conceal assets, make material misrepresentations regarding its financial condition, and hemorrhage money, all to the detriment of its creditors and the estate.

C.    **Appointment of a Trustee is in the Interests of Creditors.**

In addition, appointment of a trustee is in the best interests of Debtor's creditors and the estate. Section 1104(a)(2) of the Bankruptcy Code provides that the court "shall" order the

appointment of a Chapter 11 trustee where such "appointment is in the interests of creditors, any equity security holders, and other interests of the estate." See 11 U.S.C. §§ 1104(a)(2); *see also Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 285 B.R. 148, 158 (Bankr. D. Del. 2002). "A Bankruptcy Court has particularly wide discretion to appoint a trustee under the flexible standard of [Section 1104(a)(2)], even when no cause exists under [section] 1104(a)(1)." *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011); *Bellevue*, 171 B.R. at 623.

Section 1104(a)(2) of the Bankruptcy Code requires a bankruptcy court "to exercise its broad equity powers." *In re Russell*, 60 B.R. at 45. When assessing the interests of creditors, courts consider (1) the trustworthiness of the debtor; (2) the past and present performance of the debtor; (3) the confidence of the community and creditors in management; (4) the costs and benefits of appointing a trustee; and (5) whether the debtor has demonstrated "wanton and reckless disregard of the financial reality of the business and its creditors." *In re Madison Mgmt. Group, Inc.*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992); *see also Keeley*, 455 B.R. at 164-65; *In re PMH Corp.*, 116 B.R. 644, 646 (Bankr. N.D. Ind. 1989). In this case, each of these considerations weighs in favor of appointment of a trustee.

a. <u>The Lack of Trustworthiness of Debtor and The Lack of Confidence in Debtor's Management Supports the Appointment of a Chapter 11 Trustee.</u>

As set forth above, plentiful evidence establishes Debtor and its management's inability to report accurately and truthfully to their creditors and this Court. For several years, Debtor made material misrepresentations to UMB and kept two sets of books and records to support these misrepresentations and misstatements. Debtor did so up until filing this case, and there is no indication that its behavior has changed.

UMB repeatedly worked with Debtor to provide Debtor an opportunity to remedy its prior defaults, including entering into subsequent agreements and amending prior agreements. However, Debtor's failure to remedy its defaults and otherwise discharge its obligations has eroded any remaining trust UMB had in Debtor or its management.

The conduct of Debtor's management has illustrated that it is an untrustworthy steward of the interests of Debtor and its creditors, and UMB holds no confidence whatsoever in their commitment or ability to protect the rights of UMB, Debtor's other creditors, or the estate.

*See Keeley*, 455 B.R. at 164-65.

    b. <u>The Past and Present Performance of Debtor Supports the Appointment of a Chapter 11 Trustee</u>.

Debtor has continuously operated at a loss for the last several years, which it had kept concealed from UMB through misstatements and a second set of books and records. Unbeknownst to UMB, UMB's advances and funding are likely the sole lifeline that kept Debtor afloat while it hemorrhaged (and diverted) funds. There is no indication that Debtor is able to now turn its operations around, particularly as it will no longer be subsidized by funding from UMB.

    c. <u>Debtor's Reckless Disregard Toward UMB Supports the Appointment of a Chapter 11 Trustee</u>.

There can be no dispute that the Debtor has demonstrated reckless disregard toward its creditors. Debtor repeatedly made misrepresentations to UMB in order to induce UMB to extend additional funds to Debtor. These included misstating the value of its assets and maintaining a second set of books and records. Further, Debtor diverted funds from UMB, which funds were required to be remitted to UMB, and directed its account debtors to pay Debtor directly in an effort to evade requirements to pay UMB.

    d. <u>The Benefits Derived From The Appointment Of A Chapter 11 Trustee Far Outweigh The Costs Of Such Appointment</u>.

Appointing a trustee to oversee Debtor's estates will not disrupt its case, particularly given the nascent stage of this bankruptcy. Further, UMB has already identified a disinterested candidate for trustee who possesses industry knowledge. *See* 11 U.S.C. § 1104(b)(1) (creditors entitled to elect trustee after court orders appointment of trustee). UMB believes that Douglas P. Wilson is more than qualified to serve as Chapter 11 trustee. As set forth in his Declaration, Mr. Wilson acted as a trustee, receiver, and court-appointed fiduciary in over 1000 matters over the past 31 years with a combined asset value of $15 billion. Mr. Wilson not only has relevant industry experience, but UMB previously selected Mr. Wilson to act as a receiver over Debtor's property prior to the bankruptcy,[3] so he has already devoted significant time familiarizing himself with Debtor, its business, and its assets. (Wilson Decl. ¶¶ 3-7). He is an ideal person to perform the duties required of a Chapter 11 trustee in this case.

Appointing a Chapter 11 trustee will also be cost-effective, as it will maximize the value of

---

[3] Debtor initiated this case on the eve of UMB's filing of a motion for the appointment of Mr. Wilson as receiver.

Debtor's assets by ousting existing management, who continuously misappropriated and diverted funds to the detriment of Debtor, UMB, and all other creditors. *See In re Sharon Steel Corp.*, 86 B.R. 455, 466 (Bankr. W.D. Pa. 1988) ("In a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in . . . management.").

While debtors in Chapter 11 presumptively remain in possession of their estates, courts do not hesitate to replace them with a disinterested trustee when doing so works "to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011). The appointment of a Chapter 11 trustee here "represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 525. For these reasons, UMB's request for the appointment of a chapter 11 trustee is in the best interests of creditors and should be granted.

## V. CONCLUSION

For the foregoing reasons, immediate appointment of a Chapter 11 trustee is necessary to prevent Debtor from continuing to dissipate assets and protect the interests of creditors. UMB respectfully requests that this Court grant the Motion and appoint a Chapter 11 trustee on an emergency basis and grant such other relief as this Court deems necessary and appropriate.

Dated: May 20, 2021

BRYAN CAVE LEIGHTON PAISNER LLP

By: /s/ *H. Mark Mersel*
   H. Mark Mersel
   Olivia J. Scott
   1920 Main Street, Suite 1000
   Irvine, California 92614-7276
   Attorneys for UMB Bank, N.A.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1920 Main Street, Ste. 1000, Irvine, CA 92614

**A TRUE AND CORRECT COPY OF THE FOREGOING DOCUMENT ENTITLED (***SPECIFY***): EMERGENCY MOTION FOR APPOINTMENT OF TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 20, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Sean A. O'Keefe; Debtor's Counsel; sokeefe@okeefelc.com
US Trustee (SA); nancy.goldenberg@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) May 20, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Debtor
Syngro, Inc.
590 W. Lambert Rd.
Brea, CA  92821

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) May 20, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
**Personal Delivery**
Honorable Erithe A. Smith
USBC Central – Santa Ana
411 W. 4th Street, Room 1053
Santa Ana, CA  92701-4516

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 20, 2021 | Theresa Macaulay | /s/ Theresa Macaulay |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                                    F 9013-3.1.PROOF.SERVICE

**2. SERVED BY UNITED STATES MAIL**: (continued)

Alameda CA County Recorder
1106 Madison St.
Oakland, CA  94607

American Express
P. O. Box 981535
El Paso, TX  79998

Anthem Blue Cross
P. O. Box 511300
Los Angeles, CA  90051-7855

Bank of Hemet
Attn: Kevin R. Farrenkopf as agent
3715 Sunnyside Dr.
Riverside, CA  92506

Bank of Hemet
Mastercard Card Service Center
P. O. Box 569120
Dallas, TX  75356-9120

El Dorado CA County Recorder
360 Fair Ln.
Placerville, CA  95667

FPT USA Corp.
801 East Campbell Rd., Ste. 525
Richardson, TX  75081

Imperial CA County Recorder
940 Main St.
El Centro, CA  92243

Kern CA County Recorder
1530 Truxtun Ave.
Bakersfield, CA  93301

Sacramento CA County Recorder
600 8th Street
Sacramento, CA  95814

San Benito CA County Recorder
440 5th Street, #108
Hollister, CA  95023

San Joaquin CA County Recorder
44 N. San Joaquin St., Ste. 260
Stockton, CA  95202

Santa Clara CA County Recorder
70 W. Hedding St., 1st Fl.
San Jose, CA  95110

Stanislaus CA County Recorder
1021 I St., Ste. 101
Modesto, CA  95354

Tisdale & Nicholson LLP
2029 Century Park East, Ste. 1040
Los Angeles, CA  90067

Travelers CL Remittance Center
P. O. Box 660317
Dallas, TX  75266-3017

UDig LLC
8000 Franklin Farms Dr., Ste. 2
Henrico, VA  23229

US Small Business Administration
409 3rd St.
Washington, D.C. 20416